## UNITED STATES v. BIG HORN LAND & CATTLE CO. *

(Circuit Court of Appeals, Eighth Circuit. January 17, 1927.)

No. 7141.

**1. Waters and water courses ☞32—Grant of right of way for irrigation project held subject to forfeiture as to lake adopted as reservoir, for delaying construction (Comp. St. § 4936).**

Act March 3, 1891 (26 Stat. 1095), granting right of way over public lands for irrigation purposes to the extent of the ground occupied by the reservoir and canal and its laterals, as shown by a map to be filed and approved by the Secretary of the Interior, but providing in section 20 (Comp. St. § 4936) that, if "any section" of said canal or ditch shall not be completed within five years after its location, the grant shall be forfeited as to any uncompleted section of said canal, ditch, or reservoir,

*Rehearing denied May 19, 1927.

as applied to a project in which a natural lake is adopted as a reservoir site, the level of which is to be raised by artificial works, the reservoir is to be considered a separate section of the project, and the grant as to such lake is subject to forfeiture, if works have not been constructed within the five years which substantially raise its level.

**2. Waters and water courses ⬦⟼26—"Canal or ditch" held to mean entire irrigation project, including reservoir.**

"Canal or ditch," in statute granting right of way over public lands for irrigation works, *held* to embrace entire project, including reservoir.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Canal; Ditch.]

**3. Waters and water courses ⬦⟼32—Grant of right of way for irrigation project held subject to forfeiture as to lake used as reservoir.**

A grant of right of way over public lands for irrigation works *held* subject to forfeiture, so far as it included a natural lake as a reservoir, except as to the right to take water from the lake by means of the present outlet structure.

**4. Fish ⬦⟼3—Grant of right of way for irrigation project, including lake, does not carry monopoly of fishing privileges (Act March 3, 1891 [26 Stat. 1095]).**

A grant of right of way in public lands for an irrigation project, including a natural lake as a reservoir, does not carry exclusive fishing rights in the lake, under Act March 3, 1891 (26 Stat. 1095).

Appeal from the District Court of the United States for the District of Colorado; Orie L. Phillips, Judge.

Suit in equity by the United States against the Big Horn Land & Cattle Company. Decree for defendant, and complainant appeals. Reversed and remanded, with directions.

Ivor O. Wingren, Asst. U. S. Atty., of Denver, Colo. (George Stephan, U. S. Atty., of Denver, Colo., on the brief, and W. J. Ise, of Denver, Colo., of counsel), for the United States.

Robert L. Stearns, of Denver, Colo. (Mason A. Lewis and James B. Grant, both of Denver, Colo., and Frank L. Moorhead, of Boulder, Colo., on the brief), for appellee.

Before KENYON, Circuit Judge, and SCOTT and SANBORN, District Judges.

SCOTT, District Judge. The United States, as plaintiff, brought this suit against the Big Horn Land & Cattle Company, a Colorado corporation, to obtain a decree of forfeiture of a right of way through public lands for an irrigation ditch and reservoir, acquired by the defendant as grantee of one William Marr, who acquired the right under the Act of Congress approved March 3, 1891 (26 Stat. 1095). By the allegations of plaintiff's bill it is made to appear:

That sections 9, 20, and 21 in township 11 north, range 82 west of the sixth principal meridian, in Jackson county, Colo., were at all times a part of the public domain of the United States, and that section 16 of the same township and range, on the admission of Colorado to the Union, became a part of the school lands of that state, and so remained until the 27th day of February, 1908, on which date said section was reconveyed to the United States in exchange for other lands, and then became and thereafter remained a part of the public domain. That situated on said sections are two natural lakes, commonly called and known as "Big Creek Lakes." The smaller of said lakes is approximately circular in form, and is about one-half mile wide at its widest points, and covers an area of approximately 140 acres, and is located above and approximately 1,000 feet from the larger lake, which is about three-quarters of a mile wide and 1⅛ miles long, and covers an area of approximately 600 acres. That said lakes are connected by a natural water course, through which the waters of the smaller or upper lake flow into the larger or lower lake. That said lakes receive their water supply from Big creek, which also constitutes the outlet of said lakes. That the lakes are located close to the top of the Continental Divide, at an altitude of approximately 9,000 feet, and contain trout and other fish in large numbers, and said lakes afforded, prior to the acts of the defendant as alleged, and except for the acts of the defendant would now afford, recreation and enjoyment to the public.

That on the 8th day of June, 1899, the Secretary of the Interior of the United States approved, subject to all rights then existing, a certain map theretofore filed in the United States Land Office at Denver, Colo., by William Marr, under sections 18, 19, 20, and 21 of the Act of Congress approved March 3, 1891 (Comp. St. §§ 4934–4937), for a reservoir for irrigation purposes; said map of the reservoir being designated "Map of Big Creek Reservoir." That said reservoir, as shown by and designated on said map, is located upon sections 9, 16, 20, and 21 aforesaid, and comprises the two natural lakes, known as "Big Creek Lakes," mentioned. That defendant or its predecessors did not, prior to February 27, 1908, apply to the state of Colorado for right of way or authority to occupy said sec-

tion 16 for the purpose of said reservoir, and did not prior to said date receive from any officer of the state of Colorado any authority to construct said reservoir or to overflow the said land; nor has defendant or its predecessors made application or received from the Department of the Interior or the Department of Agriculture any permission or authority to occupy any of the lands described in the bill, except as therein set forth. That thereafter the Big Horn Land & Cattle Company succeeded to all the rights of said William Marr in said Big Creek reservoir.

That defendant or its predecessors have not completed said reservoir, or any part thereof, and no construction work has been done upon the same, although more than five years have elapsed since the approval of the said map by the Secretary of the Interior, and the natural volume of water in said lakes as they existed prior to the filing of said map has not been added to or raised by or on account of any act of the defendant or its predecessors, although the said map called for and represented construction work which would raise the waters of the larger of said lakes 16 feet above their natural level. That defendant unlawfully asserts and claims the right to the exclusive possession of the land and waters of said lakes, and for a long time past has occupied, possessed, and used, and is now using, said lakes as a private fishing preserve, and has prevented and excluded, and is now preventing and excluding, all other persons and the public generally from fishing in said lakes, and maintains posted notices in numerous places around and near the edges of said lakes, warning the public not to trespass on said land or fish in said lakes, declaring the same a "Licensed Fish Preserve."

The plaintiff further alleges that said sections 9, 20, and 21 were on the 9th day of January, 1904, withdrawn temporarily for forest purposes, and were reserved and set aside by proclamation of the President as a part of the Park Range Forest Preserve on June 12, 1905; that upon the reconveyance of said section 16 to the United States on February 27, 1908, said section thereby became a part of the Park Range Forest Reserve; that by executive order of June 25, 1908, all of the described lands were made a part of the Hayden National Forest, and now so remain.

The defendant, answering the bill, admits that on February 27, 1908, section 16 was reconveyed to the plaintiff in exchange for other lands, but denies that any of the lands described in the bill ever became a part of the Park Range Forest Reserve, or the Hayden National Forest. Defendant, further answering, alleges that that portion of said lands known as "Big Creek Lakes," and the land surrounding the same to a line 50 feet above the high-water mark, is now held and owned by the defendant by reason of the location and building thereon of a certain reservoir known as the Big Creek reservoir, which reservoir was located and title claimed thereto by reason of compliance with the laws of the United States and the state of Colorado governing the taking up, location, and acquiring title to reservoirs, reservoir sites, canals, and ditches, and that defendant and its predecessors have been in the exclusive, uninterrupted, and lawful possession of said lands and lakes since the 10th day of November, 1895, the date upon which work was commenced upon said reservoir, proper filings and claims having been made to obtain title for the same, and that the required maps and filings upon said lakes were filed with the state engineer of the state of Colorado, with the county clerk and recorder of Larimer county, Colo., said lands and reservoir being at that time in the county of Larimer, and with the Department of the Interior of the United States of America, and with the General Land Office of the United States, at Denver, Colo., and that said maps and filings were duly approved by the Acting Secretary of the Interior of the United States, on the 8th day of June, 1899, and the work contemplated by said maps and filings was duly completed within the time required by law for such completion, and said defendant and its predecessors have used said lakes and reservoir continuously from the 10th day of November, 1895, for the storage of water for the irrigation of lands, and have spent large sums of money in the construction of dams, irrigation ditches, headgates, and laterals in connection therewith, and are now irrigating approximately 4,000 acres of land by means thereof. The defendant admits the location of said "Big Creek Lakes," their form and area, and that they are connected by a natural water course, and that Big creek constitutes their source of water supply and outlet, as alleged in the bill.

The defendant further denies that it or its predecessors have not completed said reservoir, and denies that the volume of waters in said lake as they existed prior to the filing of said map has not been added to or raised on account of the acts of the defendant, and alleges that said William Marr, prior to transferring his interest in the Big Creek reservoir to the defendant company, and within 5 years from the approval of the map and filings by

the Secretary of the Interior, expended large sums of money in the construction of substantial dams upon said reservoir, which greatly enlarged and enhanced the volume of waters theretofore contained in said lakes; that the waters so impounded have been used continuously for approximately 20 years upon the lands of the defendant and its predecessors, and that the water so impounded is the only source of water by which said lands can be properly irrigated. The defendant admits that it asserts and claims the right to exclusive possession of the lands and waters of said lakes, and its right to keep notices posted and to prevent and exclude from a strip of land 50 feet above the high-water mark of said lakes, all persons, and to keep persons from trespassing upon, fishing in, or otherwise using the waters of said lakes, and admits that it asserts and claims the right to the exclusive possession of the land and water of said lakes, and alleges that for a long time past it has occupied, possessed, and used, and is now using, said lakes as a private fishing preserve, and has prevented and excluded, and is now excluding, all of the public generally from fishing in said lakes, but asserts that it has full right and authority so to do.

The foregoing sufficiently states the issues for the purposes of this opinion. Upon the trial of these issues the District Court entered a decree forfeiting the defendant's right to the upper and smaller lake, but found that the defendant and its predecessors had partially performed their obligations to the government under the map and filings, and confirmed defendant's rights to the lower lake up to a 7-foot contour line and 50 feet above the same, including the outlet through Big creek to its confluence with Independence Ditch, and said ditch to its crossing of the east line of said section 9. From this decree the United States appeals.

The following facts appear without controversy on the record:

That prior to the year 1896, William Marr and a syndicate of associates acquired about 4,000 acres of so-called sage brush land in what was then Larimer county, Colo., now Jackson county. The land lay several miles northerly from and lower in altitude than Big Creek Lakes. Early in the year 1896, Marr conceived the idea of irrigating these lands and of utilizing Big Creek Lakes as a source of water supply. Marr proposed the plan to his associates, and his suggestion was adopted, and the construction of Independence Ditch was undertaken in the fall of 1896, and at the same time work was begun to create a reservoir of Big Creek Lakes. These lakes are in location, form, and extent as alleged in the petition and admitted in the answer. Marr and his associates employed engineers to prepare a survey of the ditch and a reservoir comprising Big Creek Lakes, and commencing August 25th and ending October 1st of that year, E. E. Barker and R. F. Walter, civil engineers, surveyed and mapped the project, and on December 31, 1896, the map and survey were filed in the United States Land Office at Denver. The map shows the contour of the two lakes, Big creek as it flows into the upper lake at its southern extremity, the connection between the two lakes, a channel of about 1,000 feet in length, apparently a short section of Big creek, and Big creek again as it flows out of the lower lake at its northern end. Big creek flows through a valley or canyon in the mountains, and owing to the formation of the canyon and possibly glacial action, depressions are widened and Big Creek Lakes are formed by the waters of the creek. At the northern end of the lower lake the valley is of considerable width.

There is apparently indurative formation around the lower end of the lake with the exception of a narrow opening forming an outlet of the lake into the continuation of Big creek. The bank of the lake at the northern end, for a considerable distance on each side of the outlet, is low, and below the outlet a moraine of level gradually sloping ground exists for at least 1,000 feet or more down Big Creek Valley. The outlet of the lower lake is centrally located at its northern end, and Big creek flows thence easterly and northeasterly until it flows out of the lands in question. The general course of Independence Ditch is southwesterly and northeasterly. The map shows the ditch crossing the east line of the southeast quarter of section 9 at a point almost directly east of the outlet of the lake, extending thence northwesterly to a point near the channel of Big creek, and thence southwest paralleling Big creek to a point 518 feet from the outlet of the lake. At this point the ditch forms a confluence with Big creek. The map and survey prepared and filed show the natural contour of the lake as stated, and a 16-foot contour line around both lakes. By a 16-foot contour line is meant that line upon the surface of the ground around the lake which would be at all points 16 feet in altitude above the natural contour or water line of the lake. Vertically the 16-foot contour line and the natural contour line of the lake converge at station O of the survey directly at the outlet of the lake into Big creek;

that is, to raise the water at that point 16 feet, the dam would have to be substantially 16 feet high, or, allowing for wave action, a foot or two more. The bank of the lake at the north end for a considerable distance on each side of the outlet is comparatively low, and, while we do not have the field notes showing the elevations of the stations on the 16-foot contour line west of the outlet, the photographs of the north shore in evidence show a fairly uniform bank for perhaps 1,000 feet to the eastward of the outlet, and for several hundred feet to the westward.

Stations 183, 184, 185, 186, and 187, on the 16-foot contour line, are eastward of the outlet; station 187 being next to station O, which completes the circle of the survey. At station 183, which, judging from the testimony and the scale of the map, is about 1,000 feet from the outlet, the map shows a fill of 7.8 feet required to bring the surface to the 16-foot contour line; the same fill is required at station 184; at station 185, a fill of 4.9 feet is required, and the same fill at station 186; at station 187, a fill of 3.5 feet is required. From that station to station O, the required fill would increase to 16 feet or more, as heretofore stated. It would therefore appear that, to impound the waters of Big Creek Lakes to an elevation of 16 feet above their natural level and in conformity with the 16-foot contour line shown on the map, a dam or dike would be required of perhaps 1,500 feet or more in length, and varying from a feather edge to 16 or 18 feet in height. The walls of the valley or canyon, however, converge as they extend northward from the north end of the lake; how sharp this convergence is does not appear from the record. It does appear, however, that in the fall of 1896 Marr and his associates built a dam across Big creek at about the point where Independence Ditch forms its confluence with Big creek. Mr. Boettcher, president of the defendant corporation, and Mr. Teal, civil engineer and witness for the defendant, both testify that this dam was about 100 feet in length, and, Mr. Boettcher testifies, "extending from one side of the valley to the other and shut off the entire outlet."

It therefore appears that, when the survey was made and the map prepared in 1896, Marr and his associates had two general alternatives respecting the impounding of the waters of Big Creek Lakes: First, they could follow the indications of their map and build the extensive works necessary to raise the water on the 16-foot contour line shown on the map; or, second, they could go farther down Big Creek Valley and build a shorter dam at or below the point where their ditch formed its confluence with Big creek. Such dam raised to an elevation of 5 or 6 feet could be utilized in diverting the waters from Big creek into Independence Ditch, or, if the dam were raised to an elevation of approximately 20 feet, could be utilized to flood the waters back from that point and up to the 16-foot contour line embracing both lakes, in which case very extensive works would be required to control the water at the entrance of Independence Ditch. They evidently chose the second alternative, electing, however, to build a mere diversion dam, as no extensive works appear to have been constructed at the mouth of the ditch, for Mr. Boettcher testified that the 100-foot dam was constructed in the year 1896, "perhaps 500 or 600 feet below the outlet of the present reservoir." Mr. Teal, the defendant's engineer, puts that dam 1,000 feet below the outlet, but the evidence does not show that he measured the distance, and he apparently was not speaking accurately. That dam was built without adequate foundation, and was cut out by the waters of Big creek in the spring of 1897. This dam never succeeded in impounding any water in Big Creek Lakes. When this first dam went out, or rather one end of it, Marr and his associates abandoned the idea of damming the creek below the outlet of the lake, because the ground below, as the witnesses testify, was of glacial moraine character to a considerable depth, and rendered it impracticable to maintain a dam at that place.

In the fall of 1897 or spring of 1898, Marr and his associates adopted a third plan. This plan involved an abandonment of the 16-foot contour line, and contemplated the building of a small dam and installing a headgate at the very outlet of the lake. As to this location Mr. Boettcher, president of the defendant company, testified: "We found the foundation very much better at the edge of the lake. There was indurative rock from the other side that had apparently anchored loose material. By indurative rock I mean it was a ledge of rock running at right angles where the outlet was at that time. It looked like the whole area below consisted of this loose material, and, being so loose, would not likely be able to hold the dam. These rocks came together level. There was a sort of glade between the ends of the two indurating rocks, where apparently it had cut across a ledge of rocks to form the outlet at some previous time." The second and present small dam was built on this ledge, with the headgate and

spillway constructed in this crevice which the waters had worn through the ledge. This dam was built either in the fall of 1897 or the spring of 1898, the record does not show definitely. This second dam was about 100 feet in length, beginning at a feather edge on the ends and about 50 feet from the center, and extending to points on either side near the center of the outlet where the fill increased about 5 feet. In the center and between the points of rock mentioned, a frame and headgate was installed. This outlet structure, so called, was 6 or 7 feet wide, and 4 or 5 feet deep, and the dam was brought up against the walls of this structure. The headgate could be raised or lowered by a lever. In this way the flow of the water from the lake was controlled, and by lowering the headgate the water in the lake could be raised to the top of the dam.

There is some conflict in the testimony of the witnesses as to the exact height of the dam at the point of outlet, as to whether this outlet structure has succeeded in raising the level of the water in the lake to any appreciable extent, and, if so, how much. That matter will be considered a little later in the opinion.

After the construction of this second dam, and on December 20, 1898, Marr refiled his map in the United States Land Office at Denver, and later (the record does not show the exact date) filed the same with the Secretary of the Interior, and obtained an approval of said map on June 8, 1899, by the Interior Department through its Acting Secretary. The engineers testifying for the plaintiff and the defendant all agree that the map as filed with the Secretary of the Interior, and as approved by that department, calls for a raising and impounding of the waters of Big Creek Lakes up to the 16-foot contour line.

Defendant's engineer, Teal, testifies: "The storage capacity of the lake with the present structure is 1,075 acre feet. The filing calls for 7,302.3 acre feet." Thus, adopting defendant's contention of a 5-foot raise of the lake level, the structure creates a capacity of approximately one-tenth of that called for by the map. An acre foot is 43,560 cubic feet.

Now, there are some matters with respect to which the testimony of the witnesses of the respective parties do not fully agree. Mr. Boettcher, president of the defendant corporation, testifies that the original dam 500 or 600 feet below the outlet, was 12 to 14 feet high. Now, a dam of that height, if securely built, would have raised the waters in the lower lake approximately 9½ feet before

overflowing the dam, as the mouth of Independence Ditch is 4.4 feet below the outlet. The witness Mendenhall, engineer of the Forestry Service, testifies that he took the level between the top of the old dam and the level of the lower lake, and the difference was about 3 feet in 1921, and that the part of the old dam still existing appears to be in its original state. This would indicate that the old dam was constructed only to a height of 6 or 8 feet, even allowing for a raise of 2 feet of the waters of the lower lake in 1921, by reason of the small dam at the outlet. The witness Fellows, civil engineer, testifying for the plaintiff, says he found "what remains of a dam that was evidently constructed apparently for a diversion dam for the waters of the creek." This, and other testimony which corroborates it, together with the fact that no extensive works were constructed at the confluence of Independence Ditch with Big creek, leads us to conclude that the original dam was a mere diversion dam, and never intended to raise the waters of Big Creek Lakes to the 16-foot contour line.

There is also a conflict in the testimony of some of the witnesses as to the extent to which the present small dam has and could raise the waters of the lower lake. The engineer Fellows testifies: "At the edge of the lake, some 500 or 600 feet above the last structure described, is a low embankment across the lower end of the lake, and in that embankment, about the center of it, as a timber structure, which I did not measure as to size, but which I would say is about 8 feet in width and 4 feet high, of ordinary pine lumber." The witness concludes: "My recollection is that this construction extends on either side of the headgate 50 feet, possibly a little more, and looked to me like a closing up and raising of the original outlet, rather than an embankment across the valley at that point. The narrowing of the outlet would tend to regulate the flow of the lake. It would not raise it above the old high-water line, but it would have an effect on the discharge of the waters of the lake. I should not say that this embankment would store water above the old water line, and, in my opinion, the level of the original lake has not been appreciably raised more than a few inches."

The witness Mendenhall, engineer of the Forestry Service, testifies: "It could have been filled about one foot, or maybe two feet, but, if it had been filled to that elevation, there would have been a large amount of leakage through the dike that is at the lower end of the lake there. The dike is composed of

rocks mixed in the natural earth, and it is very narrow on top, and it would be very difficult to state whether it was natural or artificial. I would say that it wasn't over a foot or a foot and a half above the general level of the ground back of it." Mr. Teal, engineer testifying for the defendant, arrives at the conclusion that "the depth of the fill at its highest point was practically 5 feet." By a series of calculations he also concludes that this dam would raise the waters of the lower lake substantially 5 feet. Mr. Teal ran a line of levels around the lower lake to a 7-foot contour line, allowing 2 feet for wave action and high water, and this contour line was the one adopted by the District Court as a basis for its decree.

A number of witnesses who have been familiar with the lakes, one of them since a period before the construction of any of these dams, testify in effect that the waters of the lakes have not been materially raised or changed at any time. We have read the testimony of the witnesses with much care, and arrive at the conclusion that the existing dam has not and will not raise the waters of the lower lake in excess of 2 feet above its natural level.

We further conclude that, except for the renewal of headgates at the mouth of Independence Ditch and at the outlet of the lake, no material amount of work has been done on this project since a time approximately a year or a year and a half before the map was filed with and approved by the Secretary of the Interior. The map does not indicate the location of any dam, except upon the 16-foot contour line shown thereon, and is only there indicated by the calls for fills and the fact that the channel of Big creek is shown flowing from the lake at station O on that line. Of course it may be inferred that the necessary diversion structures would be required at or near the mouth of Independence creek. Now, as we have shown, the survey was made and the project mapped during the months of August, September, and October, 1896. The construction work was effected within the year following, so that William Marr and his associates must have fully known what was expected to be done at the time they filed the map and obtained the approval of the Secretary of the Interior. We cannot agree with the finding of the trial court in its decree that "the defendant and its predecessors in title, after they made this application for a right of way for a reservoir site and ditch, went out there and attempted in good faith to make the construction contemplated, and

did construct a dam in substantial compliance with the proposal." Indeed, we find no evidence of any attempt to comply with the proposal after the filing of the map with the Secretary of the Interior. They may have been in good faith when they made the survey and mapped the project, but as we read the Act of March 3, 1891, faith will only avail the applicants to the extent of their works.

We find nothing in the record to warrant the conclusion that the defendant ever acquired any rights from the state of Colorado prior to February 27, 1908. The testimony of the witness Chatfield, chief clerk of the state land office of Colorado, is to the effect that the records of that office show that section 16 was submitted as a base in Sterling selection list Nos. 170 to 173, inclusive, and that on February 27, 1908, the final approval of the exchange under clear list No. 4 was made by the Department of the Interior. The witness says: "At the time this land was transferred to the government, and where such arrangements are made, there was no incumbrance on the same. That if any rights whatever in regard to this section had been granted, or any right of way given by the state of Colorado, to the Big Horn Land & Cattle Company, or to William Marr, a certificate showing nonincumbrance could not be given." There is nothing in the record to contradict this testimony.

[1] We come now to the ultimate question: To what extent is the defendant lawfully or equitably entitled to protection, and to what extent should the rights acquired by the approval of the map be forfeited? This leads to a consideration of the language and provisions of sections 18 to 21, inclusive, of the Act of March 3, 1891 (Comp. St. §§ 4934–4937). We quote the pertinent language of these respective sections:

"Sec. 18. The right of way through the public lands and reservations of the United States is hereby granted to any canal or ditch company, * * * to the extent of the ground occupied by the water of the reservoir and of the canal and its laterals, and fifty feet on each side of the marginal limits thereof; also the right to take, from the public lands adjacent to the line of the canal or ditch, material, earth, and stone necessary for the construction of such canal or ditch. * * *

"Sec. 19. Any canal or ditch company desiring to secure the benefits of this act shall, within twelve months after the location of ten miles of its canal, if the same be upon surveyed lands, and if upon unsurveyed

lands, within twelve months after the survey thereof by the United States, file with the register of the land office for the district where such land is located a map of its canal or ditch and reservoir; and upon the approval thereof by the Secretary of the Interior the same shall be noted upon the plats in said office, and thereafter all such lands over which such rights of way shall pass shall be disposed of subject to such right of way. * * *

"Sec. 20. The provisions of this act shall apply to all canals, ditches, or reservoirs, heretofore or hereafter constructed, whether constructed by corporations, individuals, or association of individuals, on the filing of the certificates and maps herein provided for. If such ditch, canal, or reservoir, has been or shall be constructed by an individual or association of individuals, it shall be sufficient for such individual or association of individuals to file with the Secretary of the Interior, and with the register of the land office where said land is located, a map of the line of such canal, ditch, or reservoir, as in case of a corporation," et cetera: " * * * Provided, that if any section of said canal, or ditch, shall not be completed within five years after the location of said section, the rights herein granted shall be forfeited as to any uncompleted section of said canal, ditch, or reservoir, to the extent that the same is not completed at the date of the forfeiture.

"Sec. 21. Nothing in this act shall authorize such canal or ditch company to occupy such right of way except for the purpose of said canal or ditch, and then only so far as may be necessary for the construction, maintenance, and care of said canal or ditch."

The plaintiff by its bill invokes enforcement of the proviso relative to forfeiture contained in section 20. The briefs and arguments of the respective counsel present two dominant questions touching the interpretation of this forfeiture clause: First, the scope and meaning of the words "any section," when applied to the instant case; and, second, the scope and meaning of the words "any section of said canal or ditch." The first question is material in dividing the entire project into its co-ordinate parts for construction and completion purposes. It is the contention of the plaintiff that in the instant case the ditch should be considered as one section of the project, and that the reservoir should be considered as another section; that, although the ditch may be considered as having been completed, the reservoir, considered apart from the ditch, has never been the subject of any material constructive work; and

that the section comprising the reservoir is therefore a legitimate subject of forfeiture under the provisions of the act. On the contrary, the defendant contends that the whole project is an indivisible section; that, if forfeiture to any extent is decreed, a sort of horizontal division of the work called for by the map should be adopted, so as to reserve to the defendant, not only the ditch, including the channel of Big creek to the outlet of the lake, but the natural reservoir of Big Creek Lakes up to a 7-foot contour line.

The defendant's contention in this respect was adopted by the trial court in its decree. We are constrained to the opinion that such a conclusion does not evince the true interpretation of the act, at least as applied to a situation such as presented by this record. Such a conclusion and interpretation might be warranted, had the reservoir been an artificial one constructed by the defendant and its predecessors; but where the applicant adopts as a reservoir site a natural lake of such magnitude as Big Creek Lakes, and in effect covenants for the construction of artificial works calculated to co-ordinate with its natural situation and advantages so as to greatly multiply its natural capacity, we think such reservoir should be considered a separate section of the project. To conclude otherwise would subject the public domain, including such natural bodies of water, to unreasonable exploitation. As suggested by plaintiff's counsel in the brief, designing persons or corporations might easily present surveyed and mapped projects to the governmental department and procure their approval, and then with impunity construct any sort of a ditch to the outlet of such body of water, and without doing more appropriate to the exclusion of the public the whole natural body of water.

[2] Upon the second question, involving the interpretation of the words, "any section of said canal or ditch," in connection with the words later on in the proviso, "any uncompleted section of said canal, ditch, or reservoir," the defendant contends for a literal and what we think to be a very narrow interpretation of the language; that is, defendant contends that, if the canal or ditch proper and independent of the reservoir is completed, no forfeiture can be decreed under the act. It may be admitted that the proviso could have been more carefully drawn in this respect; that it would have been better to have included the word "reservoir" with the words "canal or ditch" in the first clause, as well as in the later clause of the proviso.

This does not seem to be the only place in the act where this somewhat looseness of expression is indulged in. In the last clause before the proviso in section 18 we find that the same omission occurs. We quote that clause: "Also the right to take, from the public lands adjacent to the line of the canal or ditch, material, earth, and stone necessary for the construction of such canal or ditch." Now, it would hardly be contended that the Congress by this language intended to limit the right of the applicant to take material for the construction only of the canal or ditch proper, and not for the construction of the reservoir. We think the clear spirit and intent of the act applies to a failure to complete the reservoir as well as the canal or ditch proper; that in the particular clauses mentioned the words "canal or ditch" were used in an inclusive sense, embracing the whole project.

[3] The plaintiff strenuously contends that the decree of the District Court is erroneous as to the extent which it recognizes and confirms the rights of the defendant in the public land. The decree provides: "That the defendant, the Big Horn Land & Cattle Company, be declared to be the owner of and entitled to the possession of an easement and right of way upon and over all that land covered by the Big Creek reservoir (describing the ditch and the lower lake with 50 feet beyond the marginal line of the ditch and 50 feet beyond the 7-foot contour line of said lower lake), * * * with the further right to maintain said reservoir to the height above indicated and to control said reservoir to said height and to a point 50 feet beyond," etc. "That the plaintiff is perpetually enjoined, restrained, and prohibited from claiming any right, title, or interest in and to said reservoir and land covered by the same up to the 7-foot contour line and 50 feet beyond said 7-foot contour line, as above described; and said company is decreed to be the owner of and entitled to the exclusive possession of an easement and right of way upon and over the lands and lakes hereinabove described." The decree then proceeds to forfeit the upper lake, which would in no manner be affected by the 7-foot contour line, as it lies 13 and a fraction feet above the level of the lower lake.

A considerable portion of the briefs of the respective counsel is devoted to a consideration of the nature of the title which would pass under the provisions of the Act of Congress of March 3, 1891. Counsel for plaintiff contends in effect that a mere easement passed, while counsel for the defendant contends that the act carries an estate in fee in the land. Both parties cite the language of Mr. Justice Van Devanter in Kern River Co. v. United States, 257 U. S. 147, 152, 42 S. Ct. 60, 62 (66 L. Ed. 175) wherein Mr. Justice Van Devanter says respecting a right of way under the act in question: "The right of way intended by the act was neither a mere easement nor a fee simple absolute, but a limited fee on an implied condition of reverter in the event the grantee ceased to use or retain the land for the purpose indicated in the act. Rio Grande Western Ry. Co. v. Stringham, 239 U. S. 44, 47 [36 S. Ct. 5, 60 L. Ed. 136]." Of course it is clear that Mr. Justice Van Devanter used the expression "mere easement" in its restricted sense, implying little more, if any, than a license, for it is well settled that an easement may include a fee, although, of course, not a fee simple. The common-law meaning of the expression "fee" is: "An estate of inheritance in land, being an absolute fee (fee simple) or a fee limited to a class, etc." Webster; 25 Corpus Juris, 1009, § 1.

19 Corpus Juris, 863, has this observation: "The interest of an easement may be a freehold or a chattel one, according to its duration, and may be enjoyed in fee." See, also, notes 14 and 15.

"A fee may exist in an incorporeal hereditament, and may, of course, under this principle, exist in an easement. * * * Nor is there anything novel or strange in the doctrine that there may be a fee in an easement, for an easement in an estate in land. * * * All easements are estates in land. A fee may exist in all estates in land; therefore, a fee may exist in an easement. Branson v. Studabaker, 133 Ind. 147, 165, 33 N. E. 98."

We think, it, therefore, not important whether the interest or estate passed be considered an easement or a limited fee. In any event it is a limited fee in the nature of an easement. We think, however, that the language of the decree of the District Court went somewhat beyond that necessary for the occasion, and particularly that part where the decree recites: "That the plaintiff is perpetually enjoined, restrained, and prohibited from claiming any right, title, or interest in and to said reservoir and land covered by the same up to the 7-foot contour line and 50 feet beyond said 7-foot contour line, as above described; and said company is decreed to be the owner of and entitled to the exclusive possession of an easement and right of way upon and over the lands and lakes hereinabove described."

We therefore conclude that the utmost limit to which the right of way may be confirmed in the defendant is that occupied by the ditch proper, including that portion of the bed of Big creek extending between its confluence with Independence Ditch and the outlet of the lake at station O of the 16-foot contour line survey, which portion of the creek bed was apparently adopted by the defendant's predecessors as a part of the ditch, and such adoption approved by the Secretary of the Interior in his approval of the William Marr map. This limit, "to the extent of the ground occupied by the water * * * of the canal, * * * and 50 feet on each side of the marginal limits thereof," would embrace the outlet structure, including substantially all of the small existing dam. The testimony shows that the bed of Big creek in its natural state, at the outlet of the lower lake, was approximately 25 feet in width, and probably still is, immediately below the outlet structure. This will give the defendant a right of way 125 feet in width at the shore of the lake—that is, 62½ feet on each side of the center of the headgate. We think the present outlet structure, including the small dam, no greater in extent than would be deemed necessary for the completion of the ditch and proper to the control of the water entering therein, and that such structure may therefore properly be deemed a part of the ditch. Therefore the confirmation of such right would include the right in the defendant to maintain the present outlet structure up to its present height, and to protect the same against the usual hazards.

[4] Considerable stress has been laid by defendant upon the dangers to the outlet structure from floating logs and débris. We think this could be sufficiently guarded against by merely driving a row of short piles in the shallow bed of the lake in front of the outlet structure, and there is no necessity for an exclusive right of way around the lake for such purpose. The defendant, of course, will have equal access and privileges with all other citizens of the United States to Big Creek Lakes. However highly prized may be the piscatorial privileges claimed by the defendant, we find nothing in the Act of March 3, 1891, granting to the defendant a limited fee in the land surrounding the lake for such purpose.

The decree of the District Court is reversed, and the case will be remanded to the District Court of the District of Colorado, with directions to enter a decree in harmony with this opinion.

Reversed.