## UNITED STATES v. WHEELER TP.
### No. 9596.

Circuit Court of Appeals, Eighth Circuit.
July 20, 1933.

978

Donald D. Harries, Sp. Asst. U. S. Atty., of Duluth, Minn. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., and D. N. Lindeman, of Duluth, Minn., Atty., U. S. War Department, on the brief), for the United States.

I. K. Lewis, of Duluth, Minn. (John H. Hougen, of Crookston, Minn., C. E. Berkman, of Chisholm, Minn., and Lewis, Hunt & Palmer, of Duluth, Minn., on the brief), for appellee.

Before STONE, VAN VALKENBURGH, and BOOTH, Circuit Judges.

STONE, Circuit Judge.

The United States and Canada entered into a Treaty to Regulate the Levels of the Lake of the Woods (July 17, 1925, 44 Stat. part. 3, p. 2108), which provided for a raise above natural levels. Under the treaty, the United States was to acquire perpetual flowage rights on land in the United States up to the level 1064 above sea datum. Congress passed acts (May 22, 1926, 44 Stat. pt. 2, p. 617, amended April 18, 1928, 45 Stat. pt. 1, p. 431) to carry into effect this acquisition provision of. the treaty. Having failed to agree upon a purchase price with some owners of lands affect-

ed, the United States brought a condemnation proceeding, as authorized by the above acts. Among the defendants in that proceeding was Wheeler township. This township was a local unit under the Minnesota statutes with the power and duty to construct and maintain highways within the township. It bordered the southern shore of the Lake of the Woods. The condemnation petition alleged that this and other named townships "have highways ⸱ * * which will be subjected to overflow by the raising of the level of said lake as provided in said treaty and it is hereby sought to subject said highways * * * to a perpetual easement for such overflow * * *." This appeal is by the United States from a judgment, on verdict, for $24,045.30 for compensation to the township for injury to its roads by this taking.

Appellant presents four points upon each of which it relies for reversal of this award.

■ I. *Navigation Flowage.*—The first of these is that the government is subject to no payment of damages because it has a right of flowage "in aid of navigation." The lands of the township were formerly part of a Chippewa Indian Reservation. Before they were entered for homesteads, the Act of July 1, 1898 (30 Stat. 571, 576), provided that such lands "shall be subject to the right of the United States to construct and maintain dams for the purpose of creating reservoirs in aid of navigation, and no claim or right of compensation shall accrue from the overflowing of said lands on account of the construction and maintenance of such dams or reservoirs * * * and in the disposal of each and every one of said tracts, * * * the provisions of this paragraph shall enter into and form a part of the contract of purchase or transfer of title."

Appellee contends that the above and other acts (relied upon by appellant) are not applicable to these lands. We deem it unnecessary to determine the application of these acts because we are convinced that, even if applicable to these lands, they have no force here, because the flowage involved here is not "in aid of navigation."

Article 2 of the above treaty (44 Stat. pt. 3, pp. 2108, 2109) states that the object of regulating the lake level is to secure to the inhabitants of the two countries "the most advantageous use of the waters thereof * * * for domestic and sanitary purposes, for navigation purposes, for fishing purposes, and for power, irrigation and reclamation purposes." Article 4 (page 2109) provides that the lake level shall "ordinarily be maintained" between elevations 1056 and 1061.25 sea level datum and between these elevations the regulation shall be such as to insure "the highest continuous uniform discharge of water from the lake." Article 7 (page 2110) provides for a minimum outlet discharge capacity, and requires the Dominion to provide such, either by improvement of "existing works and dams" or by additional construction. Article 9 (page 2110) provides that each nation shall assume responsibility, in its territory, for damage which may have "heretofore resulted * * * from the fluctuations of the level of Lake of the Woods or of the outflow therefrom."

The language above quoted and referred to obviously had in mind a condition existing at the time of the treaty. That condition was as follows. The outlets of the lake are in Canada. In 1898, a Canadian corporation, under Canadian governmental authority, completed a dam and control works in these outlets. This was for the sole purpose of producing power. The effect of this control was to raise the water of the lake to approximately the ordinary levels which are provided for in the treaty. This condition continued up to the time the treaty was made. It was this situation the treaty makers had in mind. It was this situation the treaty intended to perpetuate. The differences being that, instead of the lake levels being in sole control of the power company, certain levels were established and supervisory maintenance and control thereover lodged in an official body (a "Control Board") and that compensation to owners of land in the United States for this past and the future overflow from such raised levels was provided for. Having this setting in which the treaty was made, it seems clear that the main purpose was to continue the situation as to control for power with attendant protection of other interests from abuse of this power situation.

When we turn to the record, this becomes certain: An earlier Treaty of January 11, 1909 (36 Stat. pt. 2, pp. 2448, 2449, 2450, art. 3) provided for an International Joint Commission to deal with boundary waters generally. To that commission was referred the situation as to the Lake of the Woods. The commission made its final report to the two governments upon that situation. The recommendations in that report were accepted as the "basis of agreement" in Treaty of 1925 (Preamble, 44 Stat., pt. 3, p. 2108). An important witness in this case was Adolph F. Meyer, who was one of the consulting engineers of the International Joint Commission.

He was one of the engineers who investigated and reported upon the Lake of the Woods situation. The above investigation was "to determine the greatest aggregate benefit that would be secured from the use of the waters of the lake for all the interests that were interested therein." In working out the results (the water levels) it is clear—as between navigation and power interests—the purpose was not to provide water levels and reservoir storage for navigation purposes, but to provide such for power purposes without harmfully affecting navigation. The purpose and reason for the raised levels was power. It was not to "aid navigation." Navigation came into the picture merely to the extent that the establishment and maintenance of power levels *should not be harmful to navigation.* This situation is shown in the evidence of Mr. Meyer, quoted in the footnote.[1] We conclude that

overflows from these raised levels were not the result of dams or reservoirs constructed or maintained "in aid of navigation" within the acts upon which appellant relies.

■■■ II. *Highways as Property.*—Appellant contends that these township highways are not private property within the constitutional provisions guaranteeing compensation for private property taken for public use. The trial court based its determination that the township was entitled to such compensation upon St. Louis v. Western Union Teleg. Co., 148 U. S. 92, 13 S. Ct. 485, 37 L. Ed. 380. Appellant concedes the justice of the rule and further cites Town of Bedford v. United States (C. C. A. 1) 23 F.(2d) 453, 56 A. L. R. 360, to the same effect. However, it contends that in Minnesota "municipal corporations are not entitled to compensation for the taking of streets or roads; and the instant proceeding is expressly governed by the provisions of the Minnesota Constitution relating to damages in condemnation proceedings."

The first paragraph of section 1 of the Act of May 22, 1926 (44 Stat. pt. 2, p. 617), provided that condemnations for these flowage rights should be "in accordance with the pro-

---

[1] "Q. Counsel touched upon the requirements of navigation, and the possibilities of obtaining the storage for power purposes, without going to the height provided by the treaty. Will you develop just the conflict of interests there and the way in which that matter was worked out? A. In order to get a storage range for equalizing the flow of water, and still meet the requirements of navigation, we recommended a low level considerably higher than the natural low level, namely, about 1056, so as to be able to get a storage range that would permit of good equalization of flow, while at the same time meeting the requirements of navigation, and the summer resort interests, in a reasonable way.

"Q. Well, what would be the effect upon navigation of permitting the power companies to obtain that storage by drawing the water down low, rather than by storing it up?

"Mr. Harries: Objected to as irrelevant and immaterial.

"Mr. Lewis: That is the very point that you directed your examination to.

"The Court: He may answer.

"A. Additional dredging would be required in the navigation channels at Warroad and Zipple, and in the northern part of the lake the summer homes and docks there, were built at lake levels approximately the same as the ordinary maximum levels that was finally recommended, and if they had much lower levels it would have necessitated either the deepening of the channels leading to their boat houses and docks, most of which were in rock, or otherwise moving of the docks out farther. Also, the channels leading up to the mills at the outlets would have had to be deepened so as to permit the towing of the logs to the mills, and through the navigable channels and to permit getting water into the water wheels at the flour mills.

"Q. That is, as I understand you, Mr. Meyer, in order to obtain the development of a storage reservoir for the development of power, it is necessary to be permitted to pile the water up during seasons of plenty of water, and then to be permitted to draw it down low during seasons of low water?

"Mr. Harries: The same objection to that, Your Honor.

"The Court: He may answer.

"Mr. Harries: Exception.

"Q. Is that right? A. Yes.

"Q. And as I understand you, the drawing of the water down so as to afford the storage capacity by drawing the water down, would interfere with the requirements of navigation? A. Yes.

"Q. And as I understand you, it was in order to meet the requirements of the people that wanted

to use storage, that the levels were fixed where they were, having in mind, of course, the requirements also of navigation. A. Having in mind the requirements of navigation, yes.

"Q. Now did the requirements of navigation require that the level of the lake be maintained at the elevations provided for in the treaty?

"Mr. Harries: I think he has answered that.

"The Court: I don't know whether he has answered this or not, but he may answer it now.

"Mr. Harries: Exception.

"A. The requirements of navigation were such that we felt they would be reasonably met if the ordinary minimum was established at 1056—the ordinary low water was established at 1056.

"Q. And at what ordinary high? A. Well, the ordinary navigation interests were asking for around from 1058 on the United States side to 1060.6 on the Canadian side.

"Q. And at an average of approximately 1059? A. Probably between 1059.2 and 1060, because the navigation interests on the north shore were more extensive than on the south shore.

"Q. On the Canadian side? A. And the dredging on the south shore, at Warroad Harbor and Zipple, was estimated at a lesser cost.

"Q. So that the elevation then above that level was put in as complying with the requirements of the power interests?

"Mr. Harries: Objected to as calling for a conclusion, not justified by the evidence. Mr. Meyer has explained the reconciliation of the various interests, as it was handled by them.

"The Court: It does call for a conclusion. I think it is immaterial myself for what purpose it was, because it doesn't make any difference whether it was for the purpose of the power companies, or what it was for. The question here is what damage is done to the shore owners.

"Mr. Lewis: All I was seeking to develop was that it was not for the purpose of navigation.

"The Court: I see.

"Q. (continued) And that is the fact, is it not, Mr. Meyer? A. Yes."

visions of the Act entitled 'An Act to authorize condemnation of land for sites of public buildings, and for other purposes,' approved August 1, 1888" (25 Stat. 357, c. 728 [40 US CA §§ 257, 258]), which provided (section 2 [40 USCA § 258]) that the "practice, pleadings, forms and modes of proceedings" of the state wherein the condemnation took place should be followed. The Act of April 18, 1928 (45 Stat. 431, chap. 379, § 1), amended this paragraph by inserting after the above quotation (act of 1926) the following: "and in accordance with the constitutional provisions of the State of Minnesota which provide that private property shall not be taken, destroyed, or damaged for public use without just compensation therefor first paid or secured." In part, this amendment is a copy of section 13, art. 1, of the Minnesota Constitution, which is that: "Private property shall not be taken, destroyed or damaged for public use, without just compensation therefor first paid or secured." Mason's Minn. Stat. 1927, p. xviii.

The argument of appellant is that the act of 1928 required the condemnation to be in accordance with the above provision of the state Constitution; that federal courts will follow the construction thereof by the state Supreme Court and that such court has squarely decided there is no such proprietary interest in roads or streets entitling municipalities to compensation for a taking thereof in condemnation proceedings— citing City of International Falls v. Minnesota, D. & W. R. Co., 117 Minn. 14, 134 N. W. 302, 304, and Town of Kinghurst et al. v. International Lumber Co., 174 Minn. 305, 219 N. W. 172, 173.

There can be no doubt that Congress intended these condemnations to be in accordance with this provision of the Minnesota Constitution nor that federal courts will, generally speaking, follow the construction by the highest court of the state of its Constitution and statutes. How far federal courts will follow, or more properly will apply, such construction where a right under the national Constitution is involved is another matter. The Fifth Amendment prohibits the United States from taking private property for public use without just compensation and those entitled to the protection of that provision cannot lose that right because of any state constitution, statute, or judicial decision. But, for the moment, we lay aside this thought and pass to consideration of this matter as it is presented by appellant. So treated, the question is as to what construction has been placed upon this provision of the state Constitution by the state Supreme Court.

Appellant calls particular attention to expressions in each of the two above cited cases. From the City of International Falls Case it quotes as follows: "The city has no proprietary rights in its streets. Whatever rights it has it holds merely in trust for the public use. It is not entitled to compensation when a railway company acquires a right of way across its streets. Therefore, granting that the public easement in a street may be acquired by condemnation proceedings, the case does not fall within the constitutional provision that private property shall not be taken for public use without just compensation first paid or secured. Hence there is no basis for holding that equity will enjoin the taking until the compensation is paid or secured, both because the city is not entitled to compensation for the taking and because the property is not private property."

From the Town of Kinghurst Case: "Plaintiffs have no proprietary interest in the highways. No private property of plaintiffs is taken or damaged by the presence of such logging road where it crosses the highways. In a constitutional sense they have no property involved. City of International Falls v. M., D. & W. Ry. Co., 117 Minn. 14, 134 N. W. 302."

To these we may add others from City of St. Paul v. Chicago, M. & St. P. Ry. Co., 63 Minn. 330, 340, 346, and 352, 63 N. W. 267, 270, 65 N. W. 649, 650, 68 N. W. 458, 460, 34 L. R. A. 184:

"The city, in its corporate capacity, has no proprietary interest in a public street or a public levee. It holds the title merely in trust for the general public. If the public easement was to be condemned, how could its value be estimated, and to whom would the compensation be payable?"

"It is elementary law that a municipal corporation has no proprietary rights in the streets, levees, or other public grounds within its limits. Whatever rights it has it holds merely in trust for the public."

"Neither the state nor the municipality within which the property is situated has any proprietary interest in it which either of them can sell or divert to any use inconsistent with the purpose of the dedication or grant. The state holds such land merely in its sovereign capacity, in trust for the public for the purposes for which it was dedicated."

We think the above quotations are not applicable or, if applicable, are not controlling

here. We think them not applicable because of the character of issues and situations dealt with in those cases and because of the different issue and situation. here. The International Falls Case was an injunction to prevent construction of railway tracks across a city street. The Kinghurst Case was a similar action to prevent construction of a logging road across a highway under a permissive state statute. In the St. Paul Case, the main contest was one of title but there was involved, also, the power of the city to permit a railway freight depot to be built upon land dedicated by a private person for public levee purposes. None of them involved the power of eminent domain, although the above-quoted language is applicable to such power. In only one (the St. Paul Case) was there substantial interference with the prior public easement. All of them declare that the municipality or township has no "proprietary interest" in the street, highway, or levee, but that "whatever rights it has it holds merely in trust for the public use" and that (in the International Falls and Kinghurst Cases) such public use can be protected by regulation of the private use through the police power.

The situation here is essentially different. Here there is a permanent taking which will entirely destroy the public use. Here there is a duty upon the township to maintain these roads in a "reasonably passable" condition at the expense of the taxpayers of the township. Mason's Minn. Stat. 1927, §§ 2552, 2571, 2573, 2575, 2606, 2607. Here there is no doubt but that a substantial burden and expense would be cast upon the taxpayers of the township solely because of this taking. Here there is no protection through the police power of the state.

These decisions hold, rightly, that the municipality or township has no "proprietary" right in a street or highway which is lost by imposition of an additional easement thereon. Such city or township is merely the governmental unit which functions for the public in construction, maintenance, and protection of the public ways. As such, it may well be likened to a trustee for that public. But all of this does not at all mean that a paramount use of such highways which would destroy them as such and which would entail expense upon the township leaves the township (as representative of its taxpayers) to bear this loss without remedy. Yet what remedy is there here except through compensation in condemnation? This taking is lawful. It cannot be prevented. There is no place for an action for damages. The sovereignty is not subject to suit. We cannot think the Minnesota Supreme Court intended to hold that a public highway can be rendered useless therefor without redress for the public injury. In fact, it expresses the contrary in the Kinghurst Case. Therein the court states, "We see no constitutional objection to the Legislature authorizing the county board to permit an additional servitude upon the public easement *so long as it does not impair the integrity of such easement or interfere therewith*" (page 310 of 174 Minn., 219 N. W. 172, 174, italics added); and "* * * it is only where there has been a clear diversion of the highway to a use inconsistent therewith that the courts will interfere" (page 310 of 174 Minn., 219 N. W. 172, 174), citing the City of St. Paul Case; and although the statute did not so provide, the court (to preserve the validity of the statute permitting such crossings) required the company to save the county all expense of such crossing of the highway. Also, see Crist v. Minneapolis, St. P. & S. S. M. R. Co., 162 Minn. 1, 6, 202 N. W. 57; State ex rel. City of Minneapolis v. Great Northern R. Co., 136 Minn. 164, 165, 161 N. W. 506; and State ex rel. City of Minneapolis v. St. P., M. & M. Ry. Co., 35 Minn. 131, 133, 28 N. W. 3, 59 Am. Rep. 313. While the language itself, above quoted by appellant, is possibly broad enough to cover the situation here, yet, when it is understood in the light of the situations concerning which it was written and of the clear injustice which would result if it were applied to the circumstances of this case, we cannot think the Supreme Court of Minnesota intended any such application.

But if this language might be applicable, we think it cannot control here for the reasons following. All condemnations by the United States are primarily controlled by the Fifth Amendment. While the amendment reads that "*private* property cannot be taken for public use, without just compensation" (italics added), yet "*private*," as thus used, includes property which is ordinarily regarded as public property—such as that held for public uses by a state, St. Louis v. Western Union Tel. Co., 148 U. S. 92, 101, 13 S. Ct. 485, 37 L. Ed. 380, or by a municipal unit, U. S. v. Wayne County, 252 U. S. 574, 40 S. Ct. 394, 64 L. Ed. 723; Postal Telegraph-Cable Co. v. Richmond, 249 U. S. 252, 259, 260, 39 S. Ct. 265, 63 L. Ed. 590; Western Union Tel. Co. v. Richmond, 224 U. S. 160, 169, 32 S. Ct. 449, 56 L. Ed. 710; City of Richmond v. So. Bell Tel. & Teleg. Co., 174 U. S. 761, 771–773, 19 S. Ct. 778, 43 L. Ed. 1162; St. Louis v. Western Union Teleg. Co., 148 U. S. 92, 101, 13 S.

Ct. 485, 37 L. Ed. 380; Town of Bedford v. United States (C. C. A. 1) 23 F.(2d) 453, 56 A. L. R. 360—all of these cases concern streets or highways. That easements such as these highways are "property" is not open to dispute. They are interests in land—incorporeal hereditaments. Mackey v. Harmon, 34 Minn. 168, 171, 172, 24 N. W. 702; Warner v. Rogers, 23 Minn. 34, 38; United States v. Big Horn Land & Cattle Co., 17 F.(2d) 357, 365 (C. C. A. 8); Combs v. Brickhouse, 201 N. C. 366, 160 S. E. 355, 356; Boland v. Walters, 346 Ill. 184, 178 N. E. 359, 361; Eastman v. Piper, 68 Cal. App. 554, 229 P. 1002, 1004; 19 C. J. 863; 29 C. J. 540. Therefore, these highways cannot be taken and their use as such destroyed without compensation under the Fifth Amendment.

But it may be said that the act of 1928 provided that this condemnation shall be according to the requirements of the Minnesota Constitution and that Constitution must be taken to mean what the above quotations from the St. Paul and other two cases read and, so construed, there can be no compensation allowed. If that must result for the above reasons, the effect is that Congress has, by this act, lessened the protection of the Fifth Amendment. Not even Congress can do that. But another answer is that Congress had no such intention. The act of 1926 contained no reference to the Minnesota Constitution. That provision was one of the amendments in the act of 1928. The sole purpose of such amendment was to make sure that consequential damages to lands adjoining those taken should be provided for, and nothing was further from the mind of Congress than avoiding payment to any one injured by this taking (see Committee Reports, 70th Cong. 1st Session, Senate No. 670 and House No. 685). Therefore, we conclude that the construction contended for by appellant is not controlling, if it be applicable.

III. *Measure of Compensation.*—To understand the issue and the ruling of the trial court on the measure of damages, it is necessary to state certain matters outlining the situation to which the issue and ruling applied. This entire area had been part of an Indian reservation. The government acquired the Indian rights and, in 1898, opened these lands for homestead entry. In 1887, a dam was built, in Canada, across the main outlet of the lake raising the lake level. In 1895, another dam was built near the same place and the stop logs put in place in the fall of 1898. Since that time the raised lake level has been intermittently maintained with the resultant

flooding of parts of these lands. All or practically all of the lands were entered as homesteads during the period when this raised level existed. The township was organized in 1912. At the time of trial there were about twenty miles of roads in the township. About three miles of these roadways will be directly affected by the water level (1064 datum) provided for in the treaty and in this condemnation. The roads have been and are affected by the fluctuations of levels existing before and up to the condemnation suit. There is some testimony that one piece of road (to Wheeler's point) is a good class gravel surfaced road, twenty-four feet wide except at places affected by water conditions. It is undisputed that the other roads are not and never have been adequate, are "poor," "many of them are not much more than trails," are dirt roads graded up and leveled off with a grader, some in "fair condition," there are low spots in them which become practically impassable when the lake level rises. All of these roads were in use and subject to maintenance by the township when this proceeding was begun. The state law divides roads into classes of which the lowest one is township roads. Mason's Minn. Stat. 1927, § 2542. Since all of the roads involved here were established before and at the time of this condemnation action, we are concerned only in the maintenance of the roads. As to that, it is the statutory duty of the township to "improve, repair and maintain" the township roads (sections 2542, 2552, 2571, 2575, 2606, subds. 2 and 3, 2607). This means a duty to keep the roads "reasonably passable" (section 2607) and the method of compelling performance of such duty, on the petition of freeholders, is provided (section 2607). The statutes of the state create certain road officials for the state (section 2553) and for the counties (section 2569). Both the Constitution (article 16) and the statutes (chapter 13 [section 2542 et seq.]) provide for a comprehensive system of roads throughout the state made up of all the different classes of roads defined in section 2542.[2] From what has been

[2] A witness for appellant describes these different types of roads constituting this system as follows: "I am acquainted with the different types of highways in the state of Minnesota. To start with, the trunk highway roads are well designed, well built, wide, a high type of construction, to carry heavy traffic. The state aid roads are a secondary road, which is constructed to carry lighter traffic. They are not built to the standard of the trunk road, as a general rule, largely in the matter of width and the difference in grades and so on. The county aid and gas tax roads are the third class of road, which are built to withstand a lighter traffic than the state aid roads. Consequently they are not built up to the standard of the state aid roads. As a gen-

984

set out above, the conclusion must follow that the roads here involved are not up to the present standard of township roads and they have never been.

In this situation, the position of appellant is that the condemnation affects only the "physical property the condemnee had when the condemnation occurred" and, therefore, the true measure of damage is "the cost of restoring the property to the same condition after the taking as it was in before the taking" or, as otherwise expressed, "the difference in cost of constructing the township's roads under Treaty conditions to the same standard of fitness and efficiency that they had before condemnation." The contrasting position of appellee is "that it would not be practicable at all to build the type of highway which we have now, up to the elevation and on the condition that it will be necessary to withstand these [Treaty level] water conditions"; that the township is entitled to the "cheapest type of highway that will carry the traffic under the exposure that the elevation of the lake is subjecting it to"; that, therefore, the measure of damages is the difference in cost of that type of road with the lake in a state of nature and with the lake raised to the treaty levels. The contest is between the roads as they are and a type of road reasonably passable under the treaty (condemnation) lake levels. The trial court adopted the latter theory of "reasonably passable" road.

■ The situation here is peculiar. To these exceptional facts we must apply such established general principles as are applicable in order to determine the proper measure of damage—or, more accurately stated, of compensation. Both the Fifth Amendment and article 1, § 13 of the Constitution of the state of Minnesota require "just compensation." This means that the condemnee must be made whole for what is taken from him. U. S. v. Grizzard, 219 U. S. 180, 184, 31 S. Ct. 162, 55 L. Ed. 165, 31 L. R. A. (N. S.) 1135; Monongahela Nav. Co. v. U. S., 148 U. S. 312, 326, 328, 13 S. Ct. 622, 37 L. Ed. 463; Winona & St. Peter R. Co. v. Denman, 10 Minn. 267 (Gil. 208). What is here taken from the township? It is the right to maintain its roads at the natural levels of the lake.

eral rule they are narrower, and the refinements of construction and polishing, as the term is used, are not carried out. The township road in this classification would make the fourth class, and is an entirely different type of road, built and meant to carry light traffic, largely local traffic, for the farmers to get to the main road, which will lead them to their markets. It is not built as a rule to any particular standard. It is thrown up, to make a passable road under most weather conditions."

It had that right up to this condemnation. It is true it has never been able to exercise that right because before and since its organization a trespasser has unlawfully maintained the lake at higher levels, but that trespass cannot abolish or lessen the right of the township. To allow any other result would permit a deprivation through an unlawful act. Also, what appellant is here doing is taking, in a legal manner, this right to the extent of the flowage level of the treaty and of the petition in this action. To say that this taking is only of the excess level above that of the trespass would give to the condemnor and take away from the condemnee the difference between the natural and the trespass levels without any compensation therefor. This is a result not allowable in law. It is suggested by appellant that any compensation for present conditions (resulting from the trespass) should be regarded as a *past* damage to be compensated under the provision of the act of 1926 providing therefor and not in this condemnation proceeding. We think not. In the first place it is difficult to see how there could, under this record, be any legal damage for past conditions provable by the township. But more to the point, this condemnation proceeding is taking the flowage rights from the natural level up to that sought in the petition.

■ When we come to the method of ascertaining the amount of compensation—the measure of damages or compensation—we encounter the peculiarities of this situation. We have a safe starting point in the above fundamental legal proposition that the township must be made whole from money loss. When the ordinary measure of loss (decrease in actual or assumed "market value") cannot be applied, as here, then "whatever is necessary to be considered in order to determine what is an equivalent for the appropriation of private property is germane to the question of compensation." Winona & St. Peter R. Co. v. Denman, 10 Minn. 267 (Gil. 208), and see Monongahela Nav. Co. v. U. S., 148 U. S. 312, 328, 13 S. Ct. 622, 37 L. Ed. 463. Here we must be guided by this record as to what money loss will fall upon the township because of this condemnation. It is the duty of the township to maintain its roads and that duty can be enforced (see above citations from Minnesota statutes). The expense therefor comes from the taxpayers of the township, for whom the township is (in a sufficient sense) trustee and representative. The right of the township and its taxpayers is to maintain such roads with the lake at natural levels

and "the right to exoneration from the burden of constructing and maintaining a substitute way is a valuable property right belonging to the group of taxpayers called a town." Town of Bedford v. United States (C. C. A.) 23 F.(2d) 453, 456, 56 A. L. R. 360. To the extent that this burden has been increased by this taking there is a deprivation for which the law requires compensation. Is this *extent* to be measured by the present inadequate road standard or by some other? To take the present standard seems unfair and insufficient. The proper standard is not that of the present inadequate roads on the one hand nor a high grade of highway on the other. It is that type of road which it is the legally compellable duty of the township to maintain. If the present standard be taken and tomorrow the township be compelled to build a better type of road there would, unquestionably, be an added expense in building such road caused solely by this condemnation burden. Why should not this added expense be made good by the one causing it? It cannot be done except in this proceeding. The existing status is not controlling. Keefe v. Annpaul Realty Co., 215 App. Div. 301, 213 N. Y. S. 637, 642, 643; Haight v. Littlefield, 147 N. Y. 338, 343, 41 N. E. 696. On the other hand, a high type of road is too uncertain and speculative of realization to be any guide, although there would, necessarily, be this added expense from the flowage to such road if ever built. But there is no injustice to appellant in being required to make good to the township taxpayers the added expense for that character of construction and maintenance of these established roads which can, at any time, be compelled, under existing state law, by five freeholders of the township or of an adjoining township in the same county. Mason's Minn. Stat. 1927, § 2607. This standard, under that law, is a "reasonably passable" road. Section 2607. The claim of the township and the measure adopted by the trial court was that of a reasonably passable road at the places affected by this flowage easement. In fact, the evidence for appellee is that the type taken as reasonably passable is "the lowest type of road that they could build to allow any two way traffic to pass and it is the only thing that would stand up under most any traffic conditions"; that no "lower standard or of a cheaper construction * * * would stand up under the conditions that the roads are subjected to with the water elevated as provided for in the Treaty"; that it is "the cheapest and most economical type of highway that can be constructed which would stand up and furnish reasonable highway service for

Wheeler Township where the waters are left and maintained as provided for in the Treaty"; that "a less adequate plan would only be of temporary service." This evidence came from witnesses who, for the most part, were familiar with the soil and water conditions and were highly qualified by training, experience, and occupation to testify concerning roads, their construction and maintenance. The township did not claim the entire cost of building this type of road but only the difference in expense between a passable road under natural lake levels and one under the flowage levels provided for in this condemnation. We think the measure of compensation was correctly submitted.

IV. *Miscellaneous Assignments.*—Appellant argues several assignments having to do with the admission of evidence which, it claims, misled the jury as to the necessity of roads at some of the points affected by this flowage easement or as to the cost of the roads, with the flowage easement, at other affected places. We have carefully examined the record in the light of each of these assignments and, finding no error, see no necessity in discussing each of them in detail.

V. *Conclusion.*—We think no contention of appellant here has been established, and therefore the judgment should be, and is, affirmed.

BOOTH, Circuit Judge, concurs in the result.