## SELF et al. v. NEW YORK LIFE INS. CO.
### No. 9297.

Circuit Court of Appeals, Eighth Circuit.
Feb. 19, 1932.

W. R. McHaney, of Smackover, Ark., and Coulter & Coulter, of Little Rock, Ark., for appellants.

Louis H. Cooke, of New York City, W. H. Rector, of El Dorado, Ark., and A. F. House and Rose, Hemingway, Cantrell & Loughborough, all of Little Rock, Ark., for appellee.

Before KENYON, VAN VALKENBURGH, and GARDNER, Circuit Judges.

KENYON, Circuit Judge.

John I. Self on June 6, 1929, received from appellee (designated herein as the "Insurance Company") a life insurance policy obligating it to pay to appellants, as beneficiaries, the sum of $10,000 in case of his death. On July 28, 1929, he died. The Insurance Company declined to pay the policy on the ground that the insured had knowingly made false statements in his application for such insurance, that he well knew when he made the application for insurance that he was so afflicted with serious diseases of the heart and blood vessels that no honest medical examiner would approve him as a subject for insurance, that he conspired with the Insurance Company's agent, one Howell, in finding some medical examiner who would

recommend him and that they found one in the person of Dr. J. K. Sheppard, who certified to insurer that Self was in sound physical condition and approved him for the policy of insurance, and that the company did not know of the fraud until after Self's death. The trial court instructed a verdict for the defendant company.

█ Some questions preliminary to the main one should be disposed of. The beneficiaries moved in the trial court to have the answer made more specific in some particulars. The court overruled said motion and this is assigned as error. The ruling on this motion was clearly a discretionary matter with the court. The motion seems to have been made for the purpose of compelling the pleader to set forth the evidentiary facts instead of the ultimate ones. There was no abuse of discretion on the part of the trial court; hence no reversal on this ground should be indulged.

█ Appellants moved in the trial court to strike from the answer of defendant the paragraph which pleads the following provision of the policy: "That only the President, a Vice President, a Second Vice President, a Secretary or the Treasurer of the company can make, modify or discharge contracts, or waive any of the company's rights or requirements; that notice to or knowledge of the soliciting agent or the medical examiner is not notice to or knowledge of the company, and that neither one of them is authorized to accept risks or to pass upon insurability." The trial court refused to strike this allegation. Appellants claim the provision contravenes section 6061 of Crawford & Moses' Digest of the Statutes of Arkansas, which in a general way provides that any person soliciting or procuring applications for insurance shall be held to be the soliciting agent of the insurance company issuing the policy on such application, or a renewal thereof, anything in the application or policy to the contrary notwithstanding. Appellants say that the provision of the policy in suit is contrary to the public policy of the state of Arkansas and that the company was charged with any notice which its agent might have had as to certain matters. Counsel for appellants admit in their brief that the Arkansas Supreme Court has not placed any specific construction upon the statute under consideration. This statute is similar to one in the Iowa Code.

Appellants cite Jamison et al. v. State Ins. Co., 85 Iowa, 229, 52 N. W. 185, 187. This case involves a fire insurance policy where the applicant for the policy disclosed to the agent all the facts which, as accurately stated in the policy, would have shown the insurable interest in the applicant and the heirs of the estate for which she was administratrix in an amount equal to the amount of the policy. The agent erred in filling in the application making it show that the applicant alone was the beneficiary and it was without question that she alone did not have the requisite insurable interest. The court held that by virtue of the Iowa statute the agent was in fact the agent of the insurance company and that the filling in of the application was within the apparent authority of such agent. The insured was innocent of wrong and the failure of the original policy to state the truth was not in any way attributable to any intent on the part of the insured to defraud the company. The court said: "We do not hold that provisions of the character of those under consideration are wholly without effect. They may serve to draw the attention of the applicant to material matters, and, when that is done, he must act upon the notice received in good faith and with reasonable care. He cannot knowingly misrepresent a fact without endangering the validity of the policy."

Continental Life Insurance Co. v. Chamberlain, 132 U. S. 304, 10 S. Ct. 87, 33 L. Ed. 341, is also cited by appellants as sustaining their position. In this case the agent of the insurance company had made a decision with respect to a matter of interpretation which the Supreme Court held was within the scope of his apparent authority. There was no fraud imputable to the insured. There was no question of the agency or of the act of the agent in either case being within the scope of his apparent authority. This presents quite a different situation from a case where the insured knowingly and fraudulently makes material false statements with the concurrence of the agent of the company and the medical examiner. When the agent goes into a fraudulent conspiracy of the kind alleged here with the insured to defraud his principal, he is not acting within any scope of his authority. It cannot be the policy of Arkansas by this statute to establish the doctrine that if the insurance agent acts against the interest of his principal, not only with the knowledge but with the connivance of the insured, the insurance company is bound by the act of such agent. It would open a wide door of fraud and enable a triumvirate of agent, medical examiner, and insured to defraud and plunder insurance companies at will. The Arkansas statute

never, of course, intended that any such doctrine should be established as a matter of public policy.

The case of Mutual Life Insurance Co. of New York v. Hilton-Green, Executors of Wiggins, 241 U. S. 613, 622–623, 36 S. Ct. 676, 680, 60 L. Ed. 1202, seems conclusive against the position here taken by appellants. The facts are analogous to those in the case at bar, and Mr. Justice McReynolds in the opinion states: "The general rule which imputes an agent's knowledge to the principal is well established. The underlying reason for it is that an innocent third party may properly presume the agent will perform his duty and report all facts which affect the principal's interest. But this general rule does not apply when the third party knows there is no foundation for the ordinary presumption,— when he is acquainted with circumstances plainly indicating that the agent will not advise his principal. The rule is intended to protect those who exercise good faith, and not as a shield for unfair dealing."

The Arkansas statute evidently strikes at a policy pursued in the past where insurance companies ofttimes sought to make their agent the agent of the insured. The trial court was right in its ruling on this question.

■■ Another question raised is to the admission of certain declarations of deceased. The assignments of error are clearly insufficient under the rules of the court to preserve this question as no evidence is set forth in substance therein as required by Rule 11. However, notwithstanding this, we may say that there was the right in the policy for insured to change the beneficiary (stipulation covering this has been filed in this court); therefore, the beneficiary had no vested interest in the policy. It is the Arkansas rule that declarations of insured are not admissible against the beneficiary. That is the general rule, and it is based on the theory that the beneficiary has a vested interest and the insured cannot affect it by statements made by him. 14 Ruling Case Law, p. 1376, § 545. The federal courts quite generally draw a distinction where the insured reserves the right in the policy to change the beneficiary. The reason of the rule fails when the insured can change the beneficiary, as could be done here. Therefore, the statements of the deceased testified to in this case were admissible.

■ The controlling question here is whether the trial court erred in instructing a verdict for the Insurance Company. The rule as to direction of verdicts is well established in the federal court. Where the evidence is of such character that reasonable men in an impartial and fair exercise of their judgment may honestly reach different conclusions, the court should not instruct a verdict on a fact question. Tabor v. Mutual Life Ins. Co. of New York (C. C. A.) 13 F.(2d) 765; Mutual Life Ins. Co. of New York v. Hatten (C. C. A.) 17 F.(2d) 889; Wharton v. Ætna Life Ins. Co. (C. C. A.) 48 F.(2d) 37.

Did the insured knowingly make false statements in his application for insurance? The burden to show that he did rests upon the Insurance Company. We turn to the evidence. The insured was a practitioner of medicine; he had been a medical examiner for this very company. In his application for insurance is the following:

"B. Have you ever been examined either on or in anticipation of an application for insurance without receiving such insurance? B. No.

"C. Have you ever been declined for life insurance or for reinstatement of life insurance? C. No. * * *

"D. Have you been found to have a high blood pressure? D. No. * * *

"8. Have you consulted a physician for or suffered from any ailment or disease of

"a. The brain or nervous system? a. No.

"b. The heart, blood vessels or lungs? b. No. * * *

"11. What physician or physicians, if any, not named above, have you consulted or been examined or treated by within the past five years? Has no doctor but himself. Says he has not been sick enough to quit work since 1918, when he had influenza a few days."

Also in the application is this: "On behalf of myself and of every person who shall have or claim any interest in any insurance made hereunder, I declare that I have carefully read each and all of the above answers, that they are each written as made by me, and that each of them is full, complete and true, and agree that the company believing them to be true shall rely and act upon them."

It is contended by the Insurance Company that these statements were false and were known to be false when made; that the insured had been rejected some years before upon an application for insurance; that he was suffering from severe heart trouble with high blood pressure at the time of his application, which was May 31, 1929. The policy was issued June 6, 1929. He died July 28, 1929.

Dr. J. E. Clements, a practicing physician at Mount Holly, Ark., testified that Dr. Self returned to Mount Holly in the spring of 1929 and resumed his practice there. He was called in an hour or two before Self died and found him in a comatose condition from an apoplectic stroke, caused by a cerebral hemorrhage. Dr. Elsy and Dr. Thompson were present, and all concurred in the opinion that Self died as a result of high blood pressure, which is a disease progressive in its nature. Dr. Clements testified: "I would think it would have been impossible for that to have developed in recent months. I do not think it could have developed in a year."

Dr. Thompson, who was a personal friend of Dr. Self and had practiced medicine since 1914, was called in by the family at the time of his death. He states that it was the opinion of Dr. Clements and himself that he died of cerebral hemorrhage, and he testified as follows:

"Q. Did you conclude that came from high blood pressure? A. Probably.

"Q. Did you conclude that it was in any way connected with a diseased heart? A. Diseased heart and high blood pressure very frequently go together, and it is probable that it was."

He further testified that he examined Dr. Self for insurance in 1922, 1923 or 1924. His testimony was as follows: " 'Doctor came to my office for examination for life insurance, and we started the examination and got part of the way through, and he and I were personal friends, and I suggested perhaps we had better stop with it awhile, or go somewhere else. I handed him the examination blanks and he went on out. So far as that particular instance is concerned, that is all I know about it.' I suggested that he stop because his physical condition would not permit me to recommend him. I took his blood pressure. He had just driven in from Mount Holly over muddy roads, and had been stuck with a car. 'He had a little temperature, and a very tumultuous heart action; and, if I remember correctly, the blood reading at that instance was low. It was the natural result following violent exercise trying to extricate a heavy car from the mud.' His heart action indicated his heart was diseased. Acting upon that, I declined to approve him. I explained to him that his heart was in bad shape."

Attempts were made to impeach Dr. Thompson because he had not stated in private conversation before Mrs. Self and her attorney the same thing that he stated on the witness stand, but his excuse therefor was quite sufficient that he was on friendly terms with the wife and daughter and did not want to state the situation at all unless he was placed on oath. Dr. Fleming, who had been a practicing physician for twenty-three years and was medical examiner of the New York Life Insurance Company, examined Dr. Self on his application for a policy in that company. Mr. Howell, agent for the company, seems to have been engineering this matter and asked Fleming if Self was a life insurance risk. Fleming testified:

"I took Dr. Self's blood pressure, and my recollection is that it was 210 diastolic and 140 systolic. I examined his heart and found he had a dilation of the valvular rings. I told Dr. Self I did not care to finish the examination. I did not want to turn him down for insurance, so did not complete the examination. The muscular (heart) sounds were practically replaced by murmurs.

"Q. The pressure was, diastolic, 210; systolic, 140? A. Yes.

"Q. Was that seriously high? A. Well, I dislike a pressure of 140 degrees. It is a serious condition.

"I would consider the condition of his heart serious. A diseased heart with high blood pressure is a serious combination. My recollection is I tore up the application and threw it in the waste basket as soon as I had taken his blood pressure."

Dr. Self left without any comment or argument about this examination. When Agent Howell was informed by Dr. Fleming of the situation, he stated he could get some one else to look him over, and before he died Dr. Self told Dr. Fleming that he had gotten $10,000 insurance and could have gotten $20,000. This examination of Dr. Self by Dr. Fleming was toward the end of May, 1929, and must have been within a few days from the time Self signed the application for the policy in suit. Dr. Fleming further testified: "I considered that his condition approached the terminal state at that time, that he was in serious condition. He had not been in any active exercise at that time, and I did not see any evidence of shortness of breath. The condition of his heart would have precluded his taking violent exercise. He was quiet and composed. Of course his heart was beating very fast. I did not take his pulse rate or his temperature."

Mr. L. B. Smith testified that he was associated with Dr. Self in a business way and he once took an application of Dr. Self for

insurance in the Union Central Life Insurance Company, of which he was agent. This was September, 1922. The question was asked in the application of Dr. Self: "Q. The question is, 'Has any life, accident or health insurance company or association ever rejected your application for insurance or issued insurance on a different plan from that applied for?'" Objection was made and overruled and the following took place: "Q. The answer to that, 'Intersouthern, $2,000.00, plan ordinary life, date 1920.' You wrote that? A. Yes, sir."

Smith testified: "He must have given that information to me. I signed the application. I do not recall his telling me about the policy applied for with the Intersouthern. I would not think I would have written it unless he had given it to me."

This application executed by Dr. Self was admitted in evidence. Dr. Houston testified that he was an examiner for the Union Central Life Insurance Company and made an examination of Dr. Self for a policy. This is the same transaction as testified to by Smith. The application was dated September 5, 1922. One of the questions was this: "Have you been examined for or made application to any life insurance company or association, or have you any application pending upon which a policy has not been issued or upon which policy has been issued upon a different plan from the policy originally applied for?" And the answer to this seems to have been: "Yes." "High blood pressure." The witness did not remember that Self signed the application, but stated that was customary. The certificate upon which the policy was secured in this case was signed by Dr. Sheppard, who was suspended by the company on October 10, 1929, as an examiner. Agent Howell, who solicited the application and delivered the policy, was not in the employ of the company at the time of the trial and testified for appellants.

Some doctors were put on the stand who answered hypothetical questions based on the evidence, all of which went to show that Dr. Self was suffering from a severe organic condition, was in danger of sudden death from apoplexy, and that the matter could not be of sudden development.

Taking all this evidence into consideration, it is apparent that statements in the application of Dr. Self that he had never been examined in anticipation of an application for insurance without receiving such insurance, that he had never been declined for life insurance, that he had never been found to have high blood pressure, were false and must have been knowingly false to a physician and that he made no honest disclosure of his true situation. Material false statements in an application for insurance relieve an insurance company from liability if the insured knew the statements were false. There was no good faith whatever in this application for insurance made a few weeks before Self died and when, as Dr. Fleming testified, "his condition approached the terminal state." The relationship demanded fair dealing by both parties. It would be difficult to believe that Dr. Self, familiar undoubtedly with his own ailments, did not know that what he was stating in his application was in part false.

A study of this record is convincing that the insured, Agent Howell, and Dr. Sheppard practically conspired together to have Self given such a medical rating that he could secure a life insurance policy from appellee even though he was hovering on the border line of death from a diseased heart, with high blood pressure, and was in such serious condition at the time he made the application that no insurance company, had it known the truth, would have issued the policy. His high blood pressure and heart trouble could not have developed within the short time between the signing of the application and his death. No one knew better than Dr. Self that he was suffering with high blood pressure and heart disease when he signed the application. The procuring of this insurance was a fraud upon the Insurance Company, and we think no court could have permitted a verdict to stand if one had been rendered for appellants.

The judgment is affirmed.