**KARLSON et al. v. UNITED STATES.**
**OSEID. v. SAME.**

**McCAGHERTY v. SAME.**
Nos. 10369–10371.

Circuit Court of Appeals, Eighth Circuit.
March 3, 1936.

I. K. Lewis, of Duluth, Minn. (John H. Hougen, of Minneapolis, Minn., and C. E. Berkman, of Chisholm, Minn., on the brief), for appellants.

Donald D. Harries, of Duluth, Minn. (John E. Read, K. C. of the Nova Scotian Bar, Legal Adviser, Department of External Affairs, and T. L. Cory, of the Ontario Bar, Department of the Interior, both of Ottawa, Canada, on the brief), for Government of Canada (appearing pursuant to provisions of Protocol Accompanying Convention to Regulate Level of Lake of the Woods).

C. U. Landrum, Sp. Asst. U. S. Atty., of Detroit Lakes, Minn. (George F. Sullivan, U. S. Atty., of St. Paul, Minn., and D. N. Lindeman, Atty., U. S. War Department, of Duluth, Minn., on the brief), for appellee.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

SANBORN, Circuit Judge.

These are appeals from three judgments entered upon the verdicts of a jury in a condemnation proceeding brought by the United States.

The United States and Canada, in 1925, entered into a Treaty to regulate the water levels of the Lake of the Woods, which lies partly in Canada and partly in the United States. This Treaty (Lake of the Woods Convention, signed February 24, 1925, proclaimed July 17, 1925, 44 Stat. part 3, p. 2108) provided for lake levels higher than those which existed when the lake was in its natural state. Natural levels had not prevailed since 1898, when the first dams were built in the outlets of the lake in Canada, where it flows into the Winnipeg river. The Treaty of 1925 was entered into for the purpose of putting into effect the recommendations made by the International Joint Commission created by the Treaty of 1909 (36 Stat. part 2, p. 2448). That commission, after hearings and extensive study, had recommended a method for the regulation and control of the waters of the lake to provide the most advantageous use of such waters and those flowing into and out of the lake. The final report of the commission was made May 18, 1917. It constituted the basis for the Treaty of 1925. By the terms of this Treaty, a flowage easement was permitted up to elevation 1064 sea-level datum upon all lands bordering on the Lake of the Woods in the United States,

and the United States assumed all liability to the owners of such lands for the costs of such easement. (Article VIII of the Treaty.) The government of Canada, on this account, by article X of the Treaty, agreed to pay the United States $275,000, and if this sum was insufficient, to cover the cost of the undertakings assumed by the United States under article VIII of the Treaty, to pay, in addition, one-half of the cost in excess of that sum, if the expenditure was incurred within five years of the coming into force of the Treaty. Congress, in order to carry into effect the provisions of the Treaty of 1925, by an act (May 22, 1926, 44 Stat., part 2, p. 617, amended April 18, 1928, 45 Stat., part. 1, p. 431) directed the Secretary of War to acquire, by purchase or by condemnation, "the flowage easements up to elevation one thousand and sixty-four sea-level datum" (section 1) upon all lands in the state of Minnesota bordering on the Lake of the Woods, Warroad river, and Rainy river; and provided that compensation should be made in accordance with the Constitution of Minnesota, which provides (article 1, § 13): "Private property shall not be taken, destroyed or damaged for public use, without just compensation therefor first paid or secured."

Pursuant to this Act of Congress, the United States brought this condemnation proceeding, in which the appellants herein, among others, were named as respondents. They will be so referred to in this opinion, and the United States will be referred to as "petitioner."

In its original petition, the petitioner, following the language of the act, sought "the perpetual easement, right and privilege" to overflow respondents' lands up to elevation 1064 sea-level datum. The court, in accordance with the Minnesota practice, appointed commissioners to determine compensation, and awards were made by them. Thereafter, by leave of the court, the petitioner amended its petition to show that what it was seeking to acquire was "the full, complete and perpetual right, power and privilege to raise and regulate the levels of the Lake of the Woods in accordance with the provisions of the aforesaid Treaty [Treaty of 1925] and in consequence of which to overflow and otherwise affect the lands hereinafter described by such raising and regulation of said waters in accordance with said Treaty, be the consequences thereof to said tracts what they may." The judgment prayed for in the

amended petition was that the petitioner "acquire the perpetual easement, right and privilege as against all the respondents and against all persons or parties whomsoever to raise and regulate the levels of the Lake of the Woods in accordance with the provisions of the aforesaid Treaty and in consequence of which to overflow and otherwise affect the lands hereinbefore described by such raising and regulation of said waters in accordance with said Treaty, be the consequences thereof to said tracts what they may."

After the awards of the commissioners had been filed, both the petitioner and the respondents took appeals from such awards to the United States District Court for the District of Minnesota. The cases were consolidated for trial, and the issues were brought on for trial before the court and a jury. The evidence adduced at the trial is not included in the bill of exceptions. It appears from the record that counsel for respondents in their opening statement advised the jury that the principal issue in the case was "the amount of compensation to which respondents were entitled on account of the imposition by petitioner of a perpetual flowage easement on respondents' lands up to elevation 1064 sea-level datum *according to the terms of the Treaty herein involved.*" (Italics ours.)

The record also shows: That there was testimony that respondents' lands were low-lying lands not far from the shore of the lake and were affected by the flowage easement acquired. That it was respondents' contention upon the trial that, since the petitioner had acquired a perpetual flowage easement up to elevation 1064 sea-level datum, they were entitled to the fair market value of their land below elevation 1064 on the date of the acquisition of the flowage easement. That, over objection and exception of the respondents, the petitioner was permitted to show the use made by respondents of their lands lying below elevation 1064 and below elevation 1062.5 (the highest level authorized by the Treaty, although an easement to 1064 was permitted to care for wave and wind action and seepage while the level of the lake was at elevation 1062.5) and down to ordinary high-water mark with the easement imposed thereon. That respondents contended that, since the Treaty permits the level of the lake to reach elevation 1062.5 and to remain there indefinitely, any right which respondents may have to occupy or use their lands below that elevation is per-

missive and as a matter of law without market value; hence evidence that, with the lake under control, as provided by the Treaty, the lands below elevation 1062.5 had been and could be used was inadmissible. That the petitioner, on the other hand, contended that the acquisition of the easement was in accordance with the Treaty, and that evidence of any beneficial use of which the lands below elevation 1064 were capable with the easement imposed thereon should be considered in estimating damages or compensation. That the court below ruled in favor of the petitioner and received evidence, over objection and exception, that for some periods, while the levels of the Lake of the Woods were under regulation as provided in the Treaty, the level of the lake had not reached elevation 1062.5, but, on the contrary, had been below elevation 1059, and that the respondents had used their lands below elevation 1062.5 during such periods for pasture and hay, and had raised other crops thereon, and, at the time of the trial, they were using some of their lands below elevation 1062.5.

The record further shows that, at the close of the evidence, the respondents requested the court to instruct the jury as follows:

"1. The government has acquired the absolute right to flood respondents' lands up to elevation 1062.5 sea level datum, and the respondents have no right to the use or occupancy of the surface of their respective lands which shall in any way interfere with the government's absolute and permanent right to flood the same up to elevation 1062.5 sea level datum. Accordingly, you are instructed not to consider any use or occupation which respondents might make of their respective lands up to elevation 1062.5 at such times as their said lands may not be flooded up to said elevation, for such use and occupation, if any has been proved by the evidence, will be permissive only, and may not be considered by you as in any way mitigating or reducing the damage or compensation which respondents are entitled to receive on account of the perpetual flowage easement imposed upon their lands."

This instruction the court refused to give. It did give three other instructions which the respondents then requested, and which are as follows:

"2. In determining whether or not any use or occupancy which respondents may

make of their respective lands below contour 1064 sea level datum or any other contour or elevations specified by the Treaty has any fair market value, you are instructed that you should take into consideration the frequency with which said lands may be flooded or injuriously affected by water on account of the imposition of said flowage easement, the length of time during which said lands or any part thereof may be so flooded or injuriously affected, the elevation to which the level of the lake is likely to be maintained or such length of time as will injuriously affect said land and all facts and considerations tending to prove the likelihood or unlikelihood that the levels of the waters of Lake of the Woods in the future will be maintained with a maximum height or other elevations specified in the Treaty of 1925.

"4. If you find from all the evidence that the imposition of the flowage easement acquired by the government has destroyed the market value of respondents' lands below contour 1064 and that said lands below contour 1064 or any other contour specified by the Treaty of 1925 are not reasonably susceptible of any valuable use which the ordinary prudent farmer would be likely to make of them then you are instructed that such lands as you find so to be affected by said flowage easements have been rendered valueless by said flowage easement and respondents are entitled to receive a compensation therefor such a sum as will represent the fair market value of said lands on May 5, 1929, plus whatever damage you may find that respondents' lands situated above elevation 1064 have suffered, if any, on account of the imposition of said flowage easement.

"5. You are instructed that you should award to each respondent such amount, if any, as will fairly compensate them for the flowage easement acquired by the government upon his land and for such additional damage, if any, as you may find will be caused respondents or any of them on account of the imposition of the flowage easement on account of their respective lands."

No exceptions were taken to the charge of the court. The jury returned separate verdicts.[1] From the judgments entered upon these verdicts, these appeals are taken.

By their assignments of error, the respondents challenge the correctness of the court's rulings upon evidence relating to the use of their lands below elevation 1062.5.

■ Since the rules of this court (rule 23) require that such assignments of error shall quote the full evidence complained of and the rulings of the court thereon, we are precluded from considering these alleged errors.

The respondents also attack certain portions of the court's charge, wherein the jury was advised that the petitioner was not taking the fee title to any part of the lands involved, but only an easement or right to flow the lands as provided for by the Treaty, leaving the owners the right to keep and enjoy whatever value remained in their lands after the imposition of the easement; and that, in determining what substantial value, if any, was left in the lands, recourse must be had to the Treaty and to the evidence as to the actual water levels that have been maintained since the lake has been under Treaty control, and will probably be maintained to insure the highest continuous uniform discharge of water from the lake.

■ It is obvious that, in the absence of exceptions to the charge, these assignments of error cannot be considered.

However, the question which respondents seek to have us decide is raised by their assignment that the court erred in refusing their requested instruction No. 1. This question may be stated as follows:

Has the petitioner acquired an easement to continuously flood the respondents' lands up to elevation 1062.5, so that the full exercise of the right acquired would deprive them of the right to all valuable uses of their lands below that elevation?

The petitioner does not deny that it is obligated to pay compensation upon the basis that it will fully exercise the right which it has acquired, but it does deny that it has acquired any right to continuously flood the lands of the respondents up to elevation 1062.5.

■ While the respondents argue that the Act of Congress directing the Secretary of War to purchase or condemn an easement up to elevation 1064 must be regarded as a mandate to acquire the right to perpetu-

[1]

| No. 60 —Anna McCagherty | $ 922.29 |
| No. 71 —Nordahl Karlson and Randor Karlson | $1605.00 |
| No. 119—Adolph Oseid | $ 219.50 |

ally flood these lands up to at least elevation 1062.5, the highest level authorized by the Treaty, it is plain that the act, as stated in its title, was passed to carry into effect the provisions of the Treaty. This has been recognized by this court in two cases, United States v. Wheeler Township, 66 F.(2d) 977, 978, and Olson v. United States, 67 F.(2d) 24, 26, and by the Supreme Court of the United States in Olson v. United States, 292 U.S. 246, 250, 54 S. Ct. 704, 78 L.Ed. 1236. It was also impliedly recognized by counsel for respondents in their opening statement to the jury and by their adoption of elevation 1062.5 as the highest level at which the lake may at any time be maintained. The act makes no attempt to define the nature or extent of the flowage easement that is to be acquired, except to provide that it shall not extend beyond elevation 1064. No one could tell from the act itself whether the easement provided for was the right to flood these lands continuously to elevation 1064 or was the right to flood them up to that elevation once in a hundred years. It necessarily follows that, in order to ascertain the nature of this flowage easement, recourse must be had to the Treaty itself. The Articles of the Treaty (44 Stat. 2108) which are here material will be found in footnote [2].

2

### Article II.

The level of Lake of the Woods shall be regulated to the extent and in the manner provided for in the present Convention, with the object of securing to the inhabitants of the United States and Canada the most advantageous use of the waters thereof and of the waters flowing into and from the Lake on each side of the boundary between the two countries for domestic and sanitary purposes, for navigation purposes, for fishing purposes, and for power, irrigation and reclamation purposes.

### Article III.

The Government of Canada shall establish and maintain a Canadian Lake of the Woods Control Board, composed of engineers, which shall regulate and control the outflow of the waters of Lake of the Woods.

There shall be established and maintained an International Lake of the Woods Control Board composed of two engineers, one appointed by the Government of the United States and one by the Government of Canada from their respective public services, and whenever the level of the lake rises above elevation 1061 sea level datum or falls below elevation 1056 sea level datum the rate of total discharge of water from the lake shall be subject to the approval of this Board.

### Article IV.

The level of Lake of the Woods shall ordinarily be maintained between elevations 1056 and 1061.25 sea level datum, and between these two elevations the regulation shall be such as to ensure the highest continuous uniform discharge of water from the lake.

During periods of excessive precipitation the total discharge of water from the lake shall, upon the level reaching elevation 1061 sea level datum, be so regulated as to ensure that the extreme high level of the lake shall at no time exceed elevation 1062.5 sea level datum.

The level of the lake shall at no time be reduced below elevation 1056 sea level datum except during periods of low precipitation and then only upon the approval of the International Lake of the Woods Control Board and subject to such conditions and limitations as may be necessary to protect the use of the waters of the lake for domestic, sanitary, navigation and fishing purposes.

### Article V.

If in the opinion of the International Lake of the Woods Control Board the experience gained in the regulation of the lake under Articles III and IV, or the provision of additional facilities for the storage of waters tributary to the lake, demonstrates that it is practicable to permit the upper limit of the ordinary range in the levels of the lake to be raised from elevation 1061.25 sea level datum to a higher level and at the same time to prevent during periods of excessive precipitation the extreme high level of the lake from exceeding elevation 1062.5 sea level datum, this shall be permitted under such conditions as the International Lake of the Woods Control Board may prescribe. Should such permission be granted, the level at which under Article III the rate of total discharge of water from the lake becomes subject to the approval of the International Lake of the Woods Control Board may, upon the recommendation of that Board and with the approval of the International Joint Commission, be raised from elevation 1061 sea level datum to a correspondingly higher level.

### Article VI.

Any disagreement between the members of the International Lake of the Woods Control Board as to the exercise of the functions of the Board under Articles III,

An examination of these provisions of the Treaty discloses the scheme of regulation of the lake levels adopted by the two governments. In a general way, the proposal is to substitute the artificial levels specified in the Treaty for the natural levels of the lake. Under the Treaty, the ordinary low-water mark is elevation 1056, and the ordinary high-water mark elevation 1061.25. (The ordinary high-water mark of the lake in a state of nature was either elevation 1058 or 1059 or somewhere between those two elevations.) Between ordinary high and ordinary low water, under the Treaty, the regulation is to be such as to insure the highest continuous uniform discharge of water from the lake. The extreme high-water mark under the Treaty is 1062.5, and during periods of excessive precipitation, when the level of the lake reaches 1061, the regulation of the water is to be such as to insure that the extreme high level of the lake shall at no time exceed elevation 1062.5. While ordinary levels prevail, that is, levels from 1056 to 1061, the Canadian Control Board remains in control of the outflow of water from the lake. When the levels exceed 1061 or fall below 1056, the International Control Board controls the rate of total discharge. Article V of the Treaty permits the raising of the ordinary high-water mark or upper limit of the ordinary range of the levels of the lake from elevation 1061.25, provided that experience demonstrates that that can be done without causing the level of the lake to exceed elevation 1062.5 in periods of excessive precipitation. The effect, in case the upper limit of the ordinary range was raised, would be to leave the regulation of outflow in the Canadian Control Board until this higher level was reached. All that this means is that if it should be discovered that "the highest continuous uniform discharge of water from the lake" could be maintained while the levels of the lake stood at from elevation 1056 to some point above elevation 1061, without risk of the level ever exceeding 1062.5, the International Joint Commission might, upon the recommendation of the International Lake of the Woods Control Board, permit the raising of the upper level or the ordinary Treaty range to some point above 1061.25, but necessarily lower than 1062.5.

It seems fairly obvious that, for the benefit of the power interests on the Winnipeg river, the discharge of water from the lake is to be uniform and continuous during all the time that the levels of the lake are within the ordinary treaty range, while, on occasions of low precipitation or extreme precipitation, when the lake falls to the extreme low level or goes above the ordinary range of levels, the outflow is to be controlled in such a way as to bring the lake levels back within their ordinary treaty range. In any event, if the Treaty is adhered to, as it must be presumed that it will be, the extreme or emergency high level of the lake cannot be maintained continuously, since that could only be done in disregard of the provision of the Treaty as to ordinary levels and as to uniform and continuous discharge of water.

There is no way of determining from the Act of Congress authorizing the acquisition of the easement, or from the Treaty itself, for how long or during what periods the extreme high or extreme low or ordinary range of levels will prevail. To determine what the probable effect of the imposition of this easement will be upon these lands, it is necessary to consider other factors, such as the amount of annual precipitation in the territory which drains into the lake, the yearly and seasonal variations in precipitation which have occurred in the past and will therefore in all probability occur in the future, and their effect upon lake levels during the growing season.

In these cases, the petitioner is asking for and will receive no greater right to flow these lands than is authorized by the Treaty. If, in the future, a greater servitude should be placed upon these lands than that which is now authorized, we have no doubt that the respondents will be entitled to additional compensation if the val-

---

IV, and V shall be immediately referred by the Board to the International Joint Commission whose decision shall be final.

Article VII.

The outflow capacity of the outlets of Lake of the Woods shall be so enlarged as to permit the discharge of not less than forty-seven thousand cubic feet of water per second (47,000 c. f. s.) when the level of the lake is at elevation 1061 sea level datum.

The necessary works for this purpose, as well as the necessary works and dams for controlling and regulating the outflow of the water, shall be provided for at the instance of the Government of Canada, either by the improvement of existing works and dams or by the construction of additional works.

ue of their lands is adversely affected thereby. Whether the imposition of this easement deprives the respondents of all of the value which inheres in their lands below elevation 1062.5 and leaves them with nothing but a naked legal title, was a question of fact for the jury and not a question of law for the court.

Where evidence is conflicting or where different conclusions may reasonably be drawn from evidence, a question of fact is presented. Quock Ting v. United States, 140 U.S. 417, 11 S.Ct. 733, 851, 35 L.Ed. 501; Cline v. United States (C.C.A.8) 20 F.(2d) 494, 497; Reiss v. Reardon (C.C.A.8) 18 F.(2d) 200, 202; Maners v. Ahlfeldt (C.C.A.8) 59 F.(2d) 938, 939; Wisconsin & Arkansas Lumber Co. v. Day (C.C.A.8) 35 F.(2d) 563, 566; Mutual Life Ins. Co. v. Hatten (C.C.A.8) 17 F.(2d) 889; Self v. New York Life Ins. Co. (C.C.A.8) 56 F.(2d) 364; Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Bank of Union v. Fidelity & Casualty Co. (C.C.A.8) 62 F.(2d) 1040; F. T. Dooley Lumber Co. v. United States (C.C.A.8) 63 F.(2d) 384, 388, 389.

In the case of Alabama Power Co. v. Carden, 189 Ala. 384, 66 So. 596, the Supreme Court of Alabama dealt with a contention similar to that which is urged upon us by the respondents. It said at page 597 of 66 So.:

"If the effect of the dam at lock 12 was to submerge the stated area upon occasions of flood only, the appellee would have left in him the right to use the land, consistent with the condemnor's right thereto, for any purpose to which he could devote it. Where the owner, after condemnation, 'retains substantial rights in the property, he cannot insist on their value being included in the measure of his compensation.' 10 Am.&Eng.Ency. of Law, p. 1150; 2 Lewis on Eminent Domain, § 746. The owner is only entitled to be compensated for that taken and other remaining property injuriously affected in consequence. Accordingly, if the jury should find that the area was to be actually submerged upon occasions of flood only, and that these occasions would leave to the owner opportunity for its use to his own advantage, the measure of the compensation as for the property (area) thus taken is the value of that area before and after condemnation. Under such circumstances, to require the condemnor to compensate for the whole value of the area thus appropriated would necessarily afford the owner a remuneration for that of which he has not been deprived."

In Volume 20 C.J. at page 758, it is said: "Where only an easement is taken, the fact that the fee remains in the landowner must be taken into consideration, and the entire fee or rental value, is not recoverable."

A situation somewhat analogous to that with which we are confronted was presented to this court in the case of Union Electric Light & Power Co. v. Snyder Estate Co. et al., 65 F.(2d) 297, 305. There the condemnor was seeking an easement to flow certain lands in Missouri up to elevation 660 feet above mean low tide at Biloxi, Miss., and temporarily and intermittently up to elevation 670, to provide for back water influence in times of flood on the Niangua river. After trying the case upon the theory that the 670-foot level would only be reached in times of flood, and after correctly instructing the jury in this regard, the trial court, over the disclaimer of the condemnor that it ever intended to continuously flood these lands or was acquiring any right to so flood them up to elevation 670, changed the instructions and charged that the condemnor had acquired the right to permanently flood the lands up to this higher elevation and was therefore obligated to pay for that right. This court reversed the judgment on account of that error.

The Supreme Court of the United States, in United States v. Cress, 243 U.S. 316, at page 328, 37 S.Ct. 380, 385, 61 L.Ed. 746, said:

"If any substantial enjoyment of the land still remains to the owner, it may be treated as a partial instead of a total divesting of his property in the land. The taking by condemnation of an interest less than the fee is familiar in the law of eminent domain. Where formal proceedings are initiated by the party condemning, it is usual and proper to specify the precise interest taken, where less than the fee. But where, as in this case, the property owner resorts to the courts, as he may, to recover compensation for what actually has been taken, upon the principle that the government, by the very act of taking, impliedly has promised to make compensation because the dictates of justice and the terms of the 5th Amendment so require (United States v. Great Falls Mfg. Co., 112 U.S. 645, 656, 5 S.Ct. 306, 28 L.Ed. 846, 850;

United States v. Lynah, 188 U.S. 445, 465, 23 S.Ct. 349, 47 L.Ed. 539, 546), and it appears that less than the whole has been taken and is to be paid for, such a right or interest will be deemed to pass as is necessary fairly to effectuate the purpose of the taking; and where, as in this case, with respect to the 6%₀ acres, land is not constantly but only at intervals overflowed, the fee may be permitted to remain in the owner, subject to an easement in the United States to overflow it with water as often as necessarily may result from the operation of the lock and dam for purposes of navigation."

We are convinced that the respondents have retained the absolute right to make such use of their lands below elevation 1062.5 as can be made of them with the lake under control as provided by the Treaty.

That the respondents' position is untenable can be demonstrated in another way. The measure of compensation to which they were entitled was the difference between the fair market value of their lands just before and the fair market value just after the imposition of the easement. Olson v. United States, supra, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; Olson v. United States, supra, 67 F.(2d) 24, 27. That was the compensation awarded them by the jury under the instructions of the court below.

"Fair market value" is the amount that would, in all probability, have been arrived at between an owner willing to sell and a purchaser desiring to buy, and, in ascertaining that figure, "there should be taken into account all considerations that fairly might be brought forward and reasonably be given substantial weight in such bargaining." Olson v. United States, supra, 292 U.S. 246, 257, 54 S.Ct. 704, 709, 78 L.Ed. 1236. See, also, Olson v. United States (C.C.A.) 67 F.(2d) 24, 30.

Certainly, a purchaser bargaining for the respondents' lands after the imposition oɪ the flowage easement, in attempting to arrive at their fair market value, would ascertain what uses, if any, could be made of the portion of these lands lying below elevation 1062.5. He would make inquiry as to what, if any, use had been made of such portions of the lands since the Treaty levels had prevailed, and what uses the lands were presently being put to. He would inquire of those who had made a study of the lake, and were familiar with its past fluctuations and with the scheme of regulation provided by the Treaty, what the probabilities were of these lands below elevation 1062.5 being useful in the future. There is no way of avoiding the conclusion that any valuable uses which could be made of these lands with the lake under control as provided in the Treaty would have to be considered by any one fairly attempting to arrive at their market value. In admitting evidence as to the uses and usefulness of the lands below elevation 1062.5, the court below did nothing more than permit the jury to consider such information as any intelligent and fairminded person would need to have in order to form a conclusion as to what constituted fair market value of these lands after imposition of the easement.

The respondents must be made whole for what is actually taken from them, United States v. Grizzard, 219 U.S. 180, 184, 31 S.Ct. 162, 55 L.Ed. 165, 31 L.R.A. (N.S.) 1135; Monongahela Nav. Co. v. United States, 148 U.S. 312, 326, 328, 13 S.Ct. 622, 37 L.Ed. 463; United States v. Wheeler Township (C.C.A.8) 66 F.(2d) 977, 984, supra, but are not to be compensated for what is not taken.

"The just compensation required by the constitution to be made to the owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public." Bauman v. Ross, 167 U.S. 548, 574, 17 S.Ct. 966, 976, 42 L.Ed. 270; United States v. Chicago, Burlington & Quincy Railroad Co. (C.C.A.8) 82 F.(2d) 131, opinion filed February 10, 1936.

Assuming, as we must, that the jury followed the instruction of the court, it appears that the verdicts and the judgments entered thereon represent full compensation to the respondents for the flowage easement acquired by the petitioner upon the lands in question.

The judgments are affirmed.