## UNITED STATES ex rel. TENNESSEE VALLEY AUTHORITY v. INDIAN CREEK MARBLE CO. et al.

### No. 3219.

District Court, E. D. Tennessee.

July 26, 1941.

H. James Hitching, Asst. Gen. Counsel for T. V. A., and Alvin Ziegler, Atty. for T. V. A., both of Chattanooga, Tenn., and Frank Montgomery, Atty. for T. V. A., of Knoxville, Tenn., for plaintiff.

James B. Wright, of Knoxville, Tenn., and D. S. Beeler, of Rutledge, Tenn., for defendant.

TAYLOR, District Judge.

This memorandum relates to a request by the respondents to instruct the Commission, appointed by the court to fix just compensation, in certain respects deemed by respondents essential to a discharge of the Commission's duty. The just compensation to be fixed by the Commission is for certain lands taken in fee and for the imposition of easements on the premises owned in fee by the Indian Creek Marble Co.,

which premises have a certain incumbrance in the form of a lease executed by Indian Creek Marble Co. to two individuals purporting to give the lessees the exclusive right over a period of years and for a consideration to remove therefrom marble, stone and other mineral. It is stipulated in the record that the just compensation for the fee taken and for the imposition of the easements on the fee is to be divided equally between the lessor Indian Creek Marble Co. and the lessees. In view of this stipulation it is not the duty of the Commission to apportion the just compensation between the lessor and lessees.

The briefs and argument of the parties are concerned more with the questions of law involved in the requests than with the necessity, propriety or duty of the court to give instructions at all.

Since the same question of just compensation would be tried de novo by a three judge court, if exceptions are filed to the Commission's finding by either party, it is believed that there could be no valid objection to the instructions, and that instructions might be helpful to the Commission in fixing just compensation. I shall comment on certain of the principles involved by the requests, and rule specifically on certain others.

The Commission, by consent of the parties, requested the court to express an opinion as to the admissibility of a certain unauthenticated letter written purportedly by an officer of the condemnor, in which the officer expressed an opinion as to the quality or character of certain marble or stone on the property involved, and again as to the admissibility of a report of a committee of Congress which investigated certain matters in connection with T. V.A., in which report the same letter appears. It is my opinion that the letter offered is inadmissible as such, and I think as to that counsel for respondents are in at least implied accord. As to the expressions of opinion of the committee with respect to certain other purported leases, or the good faith involved in their execution or subsequent handling, this could not be competent evidence or material in establishing the similar contention or negativing such contention with respect to the execution and handling of other purported similar leases of other mineral on or under different land. This is not to be taken as an implied holding that the report would be admissible if it related to the same leases, for it is clear from the authorities examined that such report is inadmissible. 22 Corpus Juris 516; 20 Amer.Juris. 1027. In the absence of authority, the general principles involved would exclude the report as a public record or document, because the matters urged by respondents as material and admissible are expressions of opinion as distinguished from recorded facts made pursuant to the discharge of a statutory or other legal duty.

I do not deem it necessary or even proper for the court to undertake to deal with each specific request made by either the respondents or the petitioner. General principles will be discussed, and what is hereinafter said will, I think, enable the Commission to arrive at a correct conclusion as to the amount of money which will represent the just compensation provided by the Constitution of the United States, no more, no less.

The Commission is entitled under the statute, Tit. 16 U.S.C.A., § 831x, to view the property. From such view the Commission will draw proper inferences as to conditions as they existed before any taking occurred. They will consider and give due weight to the testimony of witnesses who were sworn and testified, having in mind the knowledge of each witness as to the matter covered by the testimony given. They will consider all observable matters and all facts established by the evidence tending to show any interest on the part of the witness which might or would tend to influence or color the testimony or furnish a motive for the concealment of facts known to the witness. The Commission will enter into a determination of the actual facts bearing upon the amount of compensation without prejudice. They will decide the facts entering into a determination of value with utter disregard of any and all considerations which do not affect the actual market value of the property. They will neither consider nor receive any ex parte unsworn statement of fact or expression of opinion in making their ultimate conclusion as to just compensation. They will approach their consideration of just compensation by determining the value of the whole property before any part was taken. They will do that assuming the attitude of one willing to sell, but not under pressure to sell, at its fair market price for cash. They will

consider all the elements of value inherent in the property, including the uses to which it was being put as well as the uses it was reasonably susceptible to, which would add to its market value. They will have in mind, in other words, what an intelligent owner would know of the property in so far as the evidence before them and their inspection of the property shows it. If they have before them evidence of the sale of similar property similarly situated on a free market, they may consider the price at which such similar property was sold, if within a time not too remote from the date of the taking of this property. Having thus determined the fair cash market value, they will consider the evidence before them, including facts ascertained by inspection, the effect of the taking by T.V.A., the part actually taken wholly and the part partially taken, including the reasonable probabilities as to the effect of the easements and the effect of the water impounded by Norris Dam upon the market value as of the date of the taking, considering that the depreciation in value for all the takings was fully accomplished on the day of the actual taking, that is, the date as of which they have previously fixed the unimpaired value of the property; the condition and value of the property immediately before being touched by T.V.A.; the condition and value of the property as of the same date, but assuming that as of that date all of the taking and all of the damage that would affect market value had already become an accomplished fact. Having determined these two values, the difference will represent the amount of cash due the owners, assuming it was paid on the day of the taking. If any part of the just compensation was not paid to the owners or paid into court for them when the property was taken, they will consider the question of how much additional should be paid to compensate the owners for the delay in payment. The usual rate of interest in the locality is ordinarily considered a fair measure of that amount.

Certain of the requests have to do with evaluation of just compensation on the assumption that one of the elements of value entering into it is that there is not only valuable marble on the premises, but that there was actually in operation when the taking occurred a marble quarry, and that the nature of the taking by T.V.A. damaged or wholly destroyed valuable marble, and necessitated either removal at great expense of marble shattered by the T.V.A. operations, or a re-location of the established quarry at a place on the premises where operation would be more difficult and expensive, and that just compensation would necessarily include the expense to the lessees incident to this situation. All of the damage done by T.V.A. in this particular would constitute an element requiring just compensation, if by reason of the damage the cash market value of the whole premises was reduced, the question being, would the fair cash market value of the property as a whole, taking into account its elements of value, be reduced by reason of the claimed damages, or would a buyer of the property after the damage complained of pay as much for it as he would have paid prior to the damage? If the effect of the operation of T.V.A. resulting in the shattering of certain marble deposits made no difference as to the market value of the whole, then the damage done by the operation, if any is shown to have occurred, is not to enter into the question of just compensation. A determination of this question goes, of course, to the value of the marble deposits, and whether as a marble quarry the property was valuable or was merely a mass of commercially valueless material which would not enhance the market value of the property, and if of value whether the quantities involved left room for an equal market value of the whole premises, in so far as a matter of operation is concerned, so that any marble shattered by the operations of the T.V.A. did not decrease its market value as such. The contention of T.V.A. is that the value as a marble quarry is fanciful and not real, and that on the free open market the marble deposits would not enter into the consideration price at all. The respondents contend that a buyer would pay more for the premises because of the marble deposits, because such deposits and the use of the premises as a quarry constituted a substantial addition to its market value, and would be recognized as having such value by a purchaser on the open free market. That difference of opinion they will settle on the basis of the facts shown by the evidence upon the principles suggested. If quarry value entered into the market value at all, how much less valuable as a whole was the property after T.V.A. entered and damaged the

quarrying possibilities to the extent it did, if it did, than it was as a whole before T. V.A. entered?

I am of opinion that the case of Erie Railroad Co. v. Tompkins, 304 U. S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A. L.R. 1487, has no application to condemnation cases in which the United States is a party and where the right inheres in the sovereign as a means of self preservation and of necessity, and where the question presented is clearly one involving a construction of an amendment to the Constitution of the United States, as in the case at bar. The duty imposed upon the United States by the amendment is to pay just compensation, and even the Congress of the United States could not excuse it from that obligation or establish a standard of measurement which would necessarily deprive the citizen of any part of it. The State of Tennessee has enacted no legislation intended to affect condemnation suits in which the United States is a party. Such legislation, if enacted, and if designed to give so-called compensation less than just, would be invalid. Such legislation, if it undertook to impose upon the United States, as a condition to the exercise of the right, obligations beyond those imposed in the Amendment to the Constitution, would likewise be stricken down as invalid.

The State of Tennessee cannot by statute or by decision fix either a greater or a less compensation for land taken by the United States than the Constitution of the United States provides, which is just compensation. It is inconceivable that the contention would be seriously made that either the Supreme Court of Tennessee or the legislature of Tennessee could by express decision or legislation define "just compensation" as employed in the Constitution of the United States so as to require the United States to pay a citizen of Tennessee a greater sum for taking a fee or an easement than it would be required to pay a citizen of another State for a fee or easement of exactly the same value.

The only difference between this suppositious legislation or decision and the insistence of the land owner here is that the measure contended for is based upon decisions of the Supreme Court of Tennessee in which that court has decided that in cases of eminent domain to which the United States was not a party that incidental benefits could only reduce compensation to be otherwise awarded for incidental damages. In so far as Tennessee cases so hold they are not controlling, nor are they persuasive, because, in my opinion, such a measure is unjust or might be unjust in many instances to the public, and were compelled by the Tennessee statute, sec. 3122, Tennessee Code 1932. It is not in contemplation of law, by statute or otherwise, that after the sovereign has taken from a citizen and paid him for that which it has taken, that the citizen can on the same market sell his residue for an amount which, added to the compensation he has received, aggregates more than the value of the whole from which the part was taken. That cannot be just compensation, for just compensation is compensation only, and compensation is simply that amount of money required to leave the owner with property, including his compensation, of the same market value as that which he had prior to the taking. The whole theory of compensation revolves around the idea of willingness to sell, under no compulsion, and willingness and ability to buy, but with no coercive need. In these circumstances the parties believe they have knowledge of the value, before and after. They subtract the after value from the before value, and the condemnor compensates in cash. Nothing could be fairer, and any other method of arriving at compensation could conceivably arrive at something else, either more or less, than compensation.

Under the Tennessee statute considered in Wray v. Knoxville, etc., Railroad, cited hereinafter, the valuation of the land taken, where taken and in the form taken, necessarily includes the element of the effect of carving a part from the whole, and in a relationship to the whole, such as would enhance its value to the owner, because of its severance effect upon the remainder. The fair cash value of that "particular quantity at the place and in that form would be the measure of compensation", carries the inescapable implication that the cash value contains an element of damage to the remainder of the parcel from which the condemnor took his fee or easement. It is not compensation but more than compensation to twice give the owner severance damage. If the form in which the land is taken enters into its value, it can only be upon the theory that its value is greater to the owner as a supplement to his contiguous property. Form

could not enter into the value except as it would leave that from which it is separated less valuable than before by reason of its form. If the State rule is to be so taken, then the inevitable result would be that the land owner would twice receive incidental damages, either in cash compensation or partly in cash and partly in incidental benefits. That type of so-called compensation is and must be grounded upon a statutory provision setting up an artificial measure based upon neither justice nor the settled conception of the meaning of the word "compensation". In Wray v. Knoxville, etc., Railroad, 113 Tenn. 544, 548, 82 S,W. 471, 473, in an opinion relied upon by respondents, the following significant language is found: "It will be noted that just compensation for property taken is provided for by Constitution [state and federal]. Incidental benefits and damages are creatures of statute, and are in addition to the compensation provided by the Constitution, and separate from it. [Paducah & M.] R. R. v. Stovall, 12 Heisk. [Tenn., 1], 5; Memphis v. Bolton, 9 Heisk. [Tenn.], 508; Woodfolk v. [Nashville & C.] R. R. Co., 2 Swan [Tenn., 422], 437". These cases all involve property acquired by a municipality or a railroad, and the question of the applicability of State law was, of course, not before the State court. If, as said by the court in the opinion just quoted from, the just compensation to which a citizen is entitled is provided for by the Constitution, both state and federal, it is complete in itself, and unless supplemented by federal statute, which could only prescribe rules for ascertaining it, no resort to state statutes or decisions is required, but the courts must themselves safeguard both the condemnor and the respondent to see that the just compensation is paid, and, unless Congress shall otherwise prescribe the rules for ascertaining it, see to it that respondent receives no more than the Constitution provides—compensation. It may be well to observe here that the constitutional requirement has no reference to the form in which compensation shall be paid, whether in cash or in benefits incident to the use to which the property taken is put by the condemnor. If the word "just" in the phrase "just compensation" has any significance, it would seem clear that it is a word of limitation, as though the provision read "without making a settlement with a citizen which leaves him no poorer and no richer than he was before the property was taken". The measure of riches, at least at the present time, seems to be that amount of money one could realize from the sale of his worldly possessions.

It was urged in behalf of the three respondents in the case of United States v. Meyer, 7 Cir., 113 F.2d 387, that a statute of Illinois, under the conformity act, 28 U. S.C.A. § 724, required the United States, before instituting condemnation proceedings, to undertake and fail in direct purchase from the owner. This insistence was rejected, because, as held by the court, the Illinois act relied upon dealt with substantive and not procedural law, and that conformity to its requirements was not compelled by the conformity act, which deals with form and not substance. If compliance with the Tennessee statute requires a different result as to the ultimate amount to be paid the property owner as just compensation, the Tennessee statute likewise deals with matter of substantive and not procedural law.

In the case of Kohl v. United States, 91 U.S. 367, 23 L.Ed. 449, it is held that if the United States have the power of eminent domain at all, it must be complete, and not subject either to enlargement or diminution by one of the several states, and that the manner of its exercise may not be prescribed by one of them. But it is argued in behalf of respondents here that the Tennessee statute does not enlarge or diminish the right or prescribe the manner of its exercise, as did the Illinois statute before the court in United States v. Meyer, supra; that the power is not questioned; that the conformity act is applicable because it prescribes merely a procedural method of ascertaining the amount of damage done or the amount of compensation required in each instance where land or an easement thereon, over or under, is taken in Tennessee. If compliance with the Tennessee statute requires the sovereign United States to pay more than enough to compensate, as said in Wray v. Knoxville, etc., Railroad, supra, that is, if it gives the owner something "in addition to the compensation provided by the Constitution, and separate from it", it becomes a matter of substantive law, because it conditions the right to take upon the payment of something more than the federal Constitution requires. This is the construction placed upon the statute by the Supreme

Court of Tennessee, and leaves no room for the construction insisted upon by respondents, that the statute is purely procedural, and necessarily applicable under the conformity act. Wray v. Knoxville, etc., Railroad, supra; Kanakanui v. United States, 9 Cir., 244 F. 923; Tilden v. United States, D.C., 10 F.Supp. 377.

The rule announced in this memorandum has reference to lands a part of which are actually taken, and as to a part of which easements for road locations have been imposed, and upon and/or under which lands there are deposits of marble and limestone. There is apparently no suggestion or evidence that the use to which the land taken or the easements imposed will be put will tend to enhance the value of the remaining land.

 The objection made to the before and after value rule, and pointed out in the case of Wray v. Knoxville, etc., Railroad, supra, have been considered, but the federal rule which is applicable is not in accord with the reasoning of that case, and the decision there followed the Tennessee statute. All of the elements of value entering into just compensation are contained in the federal formula. If there be other distinctions between the Tennessee rule and the federal rule as to special and incidental benefits, that is not material here, but the federal rule is clearly stated in a number of federal cases, among them United States v. River Rouge Co., 269 U.S. 411, 414-416, 46 S.Ct. 144, 70 L.Ed. 339, and cases there cited; Karlson v. United States, 8 Cir., 82 F.2d 330. See also High Bridge Lumber Company v. United States, 6 Cir., 69 F. 320; Jacobs v. United States, 290 U.S. 13, 54 S.Ct. 26, 78 L.Ed. 142, 96 A.L.R. 1.

United States v. North American Transportation & Trading Co., 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed. 935, distinguishes between cases where the right to compensation is sourced in the Fifth Amendment to the United States Constitution, and cases in which the right to compensation arises out of an implied contract. Bauman v. Ross, 167 U.S. 548, 17 S.Ct. 966, 976, 42 L.Ed. 270. In this last cited case, involving the basic question of just compensation as well as the construction of a statute of the United States relating to certain condemnation proceedings in the District of Columbia, the court said:

"The just compensation required by the constitution to be made to the owner is to be measured by the loss caused to him by the appropriation. He is entitled to receive the value of what he has been deprived of, and no more. To award him less would be unjust to him; to award him more would be unjust to the public.

"Consequently, when part only of a parcel of land is taken for a highway, the value of that part is not the sole measure of the compensation or damages to be paid to the owner; but the incidental injury or benefit to the part not taken is also to be considered. When the part not taken is left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account. When, on the other hand, the part which he retains is specially and directly increased in value by the public improvement, the damages to the whole parcel by the appropriation of part of it are lessened".

And in the case of United States v. River Rouge Company, supra, the court held, at page 415, of 269 U.S., at page 146 of 46 S. Ct., 70 L.Ed. 339: "We are of opinion that an increase in the value of the remaining portion of any parcel of land caused by its frontage on the widened river, carrying a right of immediate access to and use of the improved stream, would constitute a special and direct benefit within the meaning of the statute, as distinguished from a benefit common to all the lands in the vicinity, although the remaining portions of other riparian parcels would be similarly benefited. This is in accordance with the rule recognized by this court and established by the weight of authority in the state courts in reference to special benefits to lands abutting upon a new or widened street". Citing Bauman v. Ross, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270; Allen v. Charleston, 109 Mass. 243; Hilbourne v. Suffolk, 120 Mass. 393, 21 Am. Rep. 522; Cross v. Plymouth, 125 Mass. 557; 2 Lewis Eminent Domain, 3rd Ed., sec. 702, p. 1216, inter alia.

The right of action in the land owner where condemnation proceedings are involved, as distinguished from takings under circumstances in which the right of action arises from implied contractual obligation, is grounded in the Fifth Amendment to the Constitution, or in the specific statute authorizing the taking, or both, and where the right to compensation is so rooted, the case of Erie Railroad Co. v. Tompkins,

304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, has no application.

■ It is contended that there is a difference between the so-called federal rule and the Tennessee rule as to the effect of an easement. The Tennessee rule is that the compensation to be paid the owner is to be upon the assumption that the easement will be enjoyed to its fullest extent. That appears to be the Tennessee rule, and it is also the federal rule, except under the federal rule the just compensation to be paid the land owner turns upon the question of the effect the right to the enjoyment of the easement to its fullest extent will have upon the cash market value of the property upon which the easement is imposed. Under either rule, whether the loss to the owner is to be paid as for damages inflicted by the imposition of an easement or by way of just compensation for the thing taken, the result should be the same if the market value of the property before and after the imposition or taking is used as the measure of loss or damage. The question is, how does the easement affect the market price of the property? Here again we have the willing and intelligent buyer and seller, neither acting under compulsion. They agree upon a price before the easement is imposed. But before the sale is closed the easement is imposed. They meet again, both willing to deal on the basis, of course, of the fair market value. But the situation is changed in one particular—the imposition of the easement or easements. The question is, how does the changed situation affect the market price? The willing prospective buyer examines the instrument creating the outstanding easement as to its terms, whether it is perpetual; to what extent does it limit the use of the servient estate, and what are the maximum uses granted by the instrument? All in all, how much less valuable do the outstanding easements make the whole property? Specifically if the imposed easements leave the property less marketable because as to some of it the owner of the fee or servient estate cannot use it at all or cannot use it as effectively or profitably, the Commission will, from the material facts before it, determine the extent to which the inability to use the property upon which the easement is imposed at all or in parts, affects the fair cash market price of the whole. The adverse effect upon the market price, that is, the amount the imposition of the easement has reduced it, will constitute the just compensation due the owner. It is seen, therefore, that the effect of the easement upon the uses of the servient estate becomes a question of fact to be worked out by the Commission from the evidence before it. If the marble beneath and adjacent to the easement of road right of way has an element of profitable usability which would add market value to the premises, and if the terms of the easement of right of way destroys that valuable right to quarry and market such marble, and if by reason of the destruction of that valuable use the market value of the premises has been reduced, that and similar invasions of T.V.A. so adversely affecting the market value would be considered as elements entering into just compensation. If, on the other hand, the presence of marble on the property does not bear upon or influence the fair cash market value of the premises at all, or if the uses of the marble left to the servient estate are such as that the adverse effect upon the uses of some of it incident to the imposition of the easement, under all the facts and circumstances of the instant case, would not, in the opinion of the Commission, on the basis of the evidence before it, reduce the market value of the whole, then the particular easement would not require the payment of any compensation for loss of the right to quarry it, for the reason that the contiguous land of an owner suited for similar uses is to be treated as a parcel, and the imposition of easements or the taking of parts thereof are to be considered on the basis of their effect upon the market value of such contiguous property of the owner. Property of the same owner, even though contiguous, if dissimilar in the valuable uses to which it may be put, would not be within this general principle, if to arrive at just compensation it should become necessary to treat the property, even though contiguous, as distinct parcels.

■ The Commission should fix just compensation for each parcel taken and for each easement imposed, but the aggregate shall not exceed the difference between the before and after value of the entire boundary.

It will be noted, too, that the rule announced in the case of United States v. River Rouge Co., supra, leaves room for differences of opinion as to benefits to the

remainder of the property from which a part has been taken by the sovereign, as to whether or not the benefits are special incidental benefits, incident to the use to which the severed property has been put, or whether the benefit so accruing is one common to all property in the vicinity to which the citizen would apparently be entitled, and of which he might not be deprived by way of its offset against severance damages adversely affecting the fair, cash market value of the whole property. This distinction is of no importance in the instant case, perhaps, but it is desirable that the observation be made to indicate the limited application of some of the general terms employed throughout this memorandum. As to a proper application of that principle I express no opinion.

Fixing just compensation for land taken by multiplying the number of cubic feet or yards or tons by a given price per unit has met with almost uniform disapproval of the courts. This is true because such valuation involves all of the unknown and uncertain elements which enter into the operation of the business of producing and marketing the product. It assumes not only the existence, but the continued existence of a stable demand at a stable price. It assumes a stable production cost and eliminates the risks all business men know attend the steps essential to the conduct of a manufacturing enterprise. It eliminates the possible competition of better materials of the same general description and of the possible substitution of other and more desirable materials produced or possible of production by man's ingenuity, even to the extent of rendering the involved material unmarketable. It involves the assumption that human intelligence and business capacity are negligible elements in the successful conduct of business. It would require the enumeration of every cause of business disaster to point out the fallacy of using this method of arriving at just compensation. No man of

business experience would buy property on that theory of value. True it is that quality and quantity have a place in the mind of the buyer and the seller, but the product of these multiplied by a price per unit should be rejected as indicating market value when the willing seller meets the willing buyer, assuming both to be intelligent. Values fixed by witnesses on such a basis are practically worthless, and should not be accepted. To the extent the valuation fixed by any witness contains this speculative element, to the same extent is its value as evidence reduced.

It is not clear whether the question of the effect of bad faith will enter into the Commission's deliberations on the basis of evidence either direct or circumstantial. The transcript of the evidence is not before me. The Commission would award just compensation for the property taken in any event. But if bad faith should appear from direct or circumstantial evidence, and if the Commission should, on the basis of such evidence, believe that the original market value of the property had been enhanced or increased by expenditures made on the premises intended to support unreal and non existent value, the Commission, in that event, would disallow as just compensation any enhancement to the market value attributable to such expenditures.

The court regrets its inability to pass by unnoticed certain unjustifiable and improper comments contained in respondents' brief, which provoked milder, more subtle and justifiable response. The court must, in order to discharge its functions to the maximum, have a respectful, cordial and cooperative attitude among its officers. A sharp, ugly or disrespectful attitude on the part of one officer of the court toward another adds nothing to the pleasure of judicial position, to the respect of the public for the bar, and certainly is not helpful to the court in the performance of its difficult duties.