The state of Ohio appropriated for highway purposes approximately 20 acres of land belonging to Robert T. Caperton and Elvetta L. Caperton. There was a large deposit of sand and gravel underlying this land, which, at the time of the appropriation, was being removed by a sublessee, M. S. *Page 129 
Worth, doing business as Lodi Sand and Gravel Company. The Capertons had originally leased the land to W. W. McVicker and J. D. McVicker for the purpose of removing sand and gravel therefrom. These latter, or primary, lessees subleased the land to Worth, who began the extraction of sand and gravel by erecting various buildings and digging a settling pond on the premises. There were no buildings taken, or damaged, in this appropriation. The highway separates the principal building from a portion of the sand and gravel pit, and the highway appropriation caused this settling pond to become smaller in area.
After the filing of the intention to appropriate the land for highway purposes, the Capertons reached an agreement with the state of Ohio with reference to the value of the land taken, and the damage to the residue. That amount was fixed at $160,000, which sum of money was paid to the Clerk of Courts of Medina County, who holds such sum pending a determination as to the amount to which each of the claimants is entitled. The Court of Common Pleas of Medina County made the following distribution of this money: Worth, $86,349; Capertons, $41,354; and McVickers, $32,297.
It is from this distribution that an appeal on questions of law is lodged in this court by the Capertons; and a cross-appeal is lodged by the appellee Worth.
The rent fixed in both the primary lease, and the sublease, is as follows: The McVickers are obligated to pay the Capertons $500 per year as ground rent, and eight cents per cubic yard for the material extracted; Worth is obligated to pay the McVickers $750 per year, and twelve cents per cubic yard for the sand and gravel extracted. There is a provision for the removal of soil at a lesser royalty. No minimum amount of extraction is required in either lease. The leases are for a period of 20 years, with an option for ten additional years, although either lessee may terminate, without penalty, by not paying the yearly rent. The leases give only the right to remove the sand and gravel, and give no ownership in those materials in the ground. The Worth lease expires a few months before the McVicker lease.
There are certain fixed principles with respect to the rights of these parties in appropriation matters, and recent Ohio cases have carefully set them out. *Page 130 
In paragraph one of the syllabus in the case of Sowers,Supt., v. Schaeffer, 155 Ohio St. 454, the Supreme Court said:
"A land appropriation proceeding is essentially one in rem; it is not the taking of the rights of persons in the ordinary sense but an appropriation of physical property. In the event there are several interests or estates in the parcel of real estate appropriated, the proper method of fixing the value of each interest or estate is to determine the value of the property as a whole, with a later apportionment of the amount awarded among the several owners according to their respective interests, rather than to take each interest or estate as a unit and fix the value thereof separately. The separate interests or estates as between the condemner and the owners are regarded as one estate. (In re Appropriation by Supt. of Public Works,152 Ohio St. 65, approved and followed.)"
In the syllabus of the case of Queen City Realty Co. v.Linzell, Dir., 166 Ohio St. 249, the court said:
"1. In a proceeding to have a jury determine the amount to be paid as the value of real estate being appropriated for state highway purposes pursuant to the power of eminent domain, any evidence as to the value of an outstanding leasehold interest in such real estate is incompetent.
"2. In such a proceeding, evidence as to the reasonable rental value of such real estate may be admissible."
It can be noted that there may be some situations where very little, if anything, is left for the owner of the fee. If the rental value has increased greatly, such lessee may obtain all, or the lion's share, of the award.
What would a prospective purchaser of the McVickers lease pay to the McVickers for the right to receive a ground rent of $250 a year, plus a royalty of four cents a cubic yard for material removed from the premises, bearing in mind that the sublessee need not continue to take the material from the ground, and that such material will be exhausted prior to the expiration date of the lease? To determine this figure, we must know how much material is in that portion of the lands which was taken, and if, except for the highway, it is economically feasible to remove such material from that portion of the land. It is possible that this land would not be economically productive because of its location, or the lack of sufficient material in *Page 131 
the subsoil, or the poor quality of such material. The witnesses herein assumed a steady market, a stable market and a continuing supply of material. We have, however, a highly speculative problem as to the economic value of this lease as compared to the rental value.
The royalty paid by an operator of a sand and gravel pit in this vicinity for the privilege of extracting such material is twelve cents a cubic yard, plus a nominal ground rent. Thus, the McVickers have an economic advantage in both respects, for they receive $250 a year more than they are required to pay, and a bonus of four cents a cubic yard for the material Worth takes out of the ground; and if he takes no material, neither the McVickers nor the Capertons receive such payment. Thus the payment to the McVickers, and to the Capertons, depends upon the willingness of Worth to continue his operation, as well as upon the quantity, and quality, of the material to be removed. In other words, if it remains economically feasible for Worth, or any other person similarly situated, to operate this sand and gravel pit, there is then the flow of royalty payments to those others who receive income.
As to the operator, Worth, his lease is made less valuable by the reduction in size of the settling pond, and by the separation of one part, from another part, of the productive lands.
In order for Worth now to use some of the facilities necessary to process the sand and gravel for sale, he is required to truck the material a considerable distance. This, too, makes his lease less valuable and less desirable economically. The appropriation has thus taken not only some material which Worth probably would remove, but it also has made it more difficult to process the material on a part of the remaining land.
The loss of the efficient use of the structures Worth erected is an injury that surely reduces the present value of his lease, as compared to its value before the highway appropriation. Worth said that the improvements made on the land cost him about $200,000. Neither the McVickers nor the Capertons could receive any royalty payments unless such improvements, or facilities, were first erected. Worth has the right to remove all of these facilities at the expiration of his lease.
In paragraphs two and three of the syllabus ofFrownfelter v. Graham, 169 Ohio St. 309, the court said: *Page 132 
"2. In sharing the condemnation award, a lessee of such property is entitled to the market value of the right to use the property for the unexpired term over and above the amount of rent he is obligated to pay under the provisions of his lease.
"3. In evaluating the leasehold interest, it is proper to consider the rental the lessee is required to pay, the reasonable value of the use of the realty for the unexpired term of the lease, any premium paid by the lessee for the lease in addition to the subsequent rental, and any increase or decrease in the market value of the realty during the term of the lease."
Generally, then, in lease situations, in order to determine the value of the reversionary interest of the Capertons and the value of the primary lease of the McVickers, we should find the difference between the value of the Worth lease prior to, and after, the taking. (See 29A Corpus Juris Secundum 616, Eminent Domain, Section 143, n. 76.) Did such lease have an economic advantage prior to the appropriation for highway purposes, and, if it did, in what amount did such economic advantage exceed the rental contract? How much would a willing buyer, not under any compulsion to buy, pay for the Worth right to mine these materials, considering Worth's obligation to pay twelve cents a cubic yard, plus $750 a year ground rent, but only for such time as Worth, or such buyer, desired to operate the gravel pit? Can we apply the usual rule when only a portion of the leased land is taken?
At the average rate of the extraction of these materials, there would be an exhaustion of sand and gravel some years prior to the time the leases expire. These leases were executed in November 1954, and now, after the appropriation, there is a production period of six to seven years for material to be extracted from the residue, if removed at the rate material was extracted previous to the condemnation for a highway. Although if material is extracted below the water level, there may be a production period of from ten to eleven years possible.
In this case, one cannot take the estimated amount of material remaining on the Caperton land, and multiply that figure by the royalty payment due the Capertons, or the four cent bonus due the McVickers, and then determine the present value of those sums in order to arrive at the amount due Worth. The loss of royalty payments to the Captertons, and to the McVickers, *Page 133 
which is all they are to receive under the leases, either before or after the "take," will occur only after the exhaustion of the remaining land (assuming a steady removal of sand and gravel at the rate of removal preceding the take). Because of the highway appropriation, this exhaustion will take place several years sooner than otherwise would have occurred.
The Capertons have lost about twenty acres of land, and their royalty payments some years hence. There will be damage to the residue because they will be left with a farm divided into two parts. There are and will be deep holes in each part where the sand and gravel has been, and will be, removed, but they will have been compensated for that by the primary lessees, the McVickers. The McVickers have lost royalty payments some years hence; and Worth has lost the efficient use of his facilities, suffered damage to a settling pond, and loss of the profit he might make if he sold the material extracted therefrom for a profit.
The profit an operator might make is very speculative, and depends upon so many factors that it cannot be used as a guide in cases such as this, even though any purchaser would consider what he could make out of the Worth lease if he were to purchase it. See 1 Orgel on Valuation under Eminent Domain 2d 672, Section 165; and United States, ex rel. Tennessee Valley Authority, v.Indian Creek Marble Co., 40 F. Supp. 811, at 822.
We find no Ohio cases which indicate a rule to be followed where leases are given for mineral lands which subsequently are partly taken by eminent domain. The problem here would be simpler if the entire leasehold had been appropriated, for then the rule announced in the Ohio cases noted above would apply.
The first consideration is to determine whether the lease to Worth has any bonus value, that is, a value above economic rent or royalty which he pays to extract material from the land. The taking of the property here was only a partial taking, hence we cannot use as the measure of damages suffered by Worth only a difference between the amount of rent he does pay, and the amount some other operator would now pay. Since there is a reduction of the amount of available materials he can extract, there should be a determination of the reduction, if any, in the value of the leasehold because of the reduction in size of such leasehold. In other words, we believe the rule that is to be followed *Page 134 
here is found in the case of Preston, Dir., v. Pecsok, 93 Ohio Law Abs. 331, wherein the Court of Appeals of the Eighth Appellate District, at page 334, said:
"1. The taking should be considered as to the reduction, if any, of the value of the lease because of the loss of use for the remaining years of the lease of the part taken; and
"2. The reduction, if any, in the value of the lease because of the reduction of the size of the remaining part of the land for the term of the lease."
When the value of the leasehold interest of Worth is determined, then the value of the leasehold interest of the McVickers will be determined on the basis of the same reduction in size of their leasehold interest. The value of the leasehold interests must be determined first. We cannot begin by determining the damage to the owner of the fee, but must first determine leasehold damage, if any.
As so often occurs in cases such as this, the expert witnesses called by each party give to that party on whose behalf they testify the greatest advantage. In the instant case, the testimony of the experts concerning the value of damages for the operating lessee varies from zero to approximately a quarter of a million dollars.
It is impossible, because of the manner in which the amount of damages herein was determined, to make any modification of the awards given by the Court of Common Pleas. It becomes our duty, then, to reverse the judgment rendered herein as being contrary to law, and to remand the case to the trial court for the purpose of reassessing such damages in accordance with the opinions expressed herein.
The judgment is reversed, and the cause is remanded for reassessment of damages.
Judgment reversed.
DOYLE, P. J., BRENNEMAN and HUNSICKER, JJ., concur. *Page 135